82 A.3d 998

**COMMONWEALTH of Pennsylvania, Appellee**

v.

**Harvey Miguel ROBINSON, Appellant.**

Supreme Court of Pennsylvania.

Submitted May 30, 2013.

Decided Dec. 27, 2013.

Eric John Montroy, Esq., Ayanna Williams, Esq., Federal Community Defender Office, Eastern District of PA, James H. Moreno, Esq., Defender Association of Philadelphia, for Harvey Miguel Robinson.

Heather F. Gallagher, Esq., Havertown, Stephen Michael VanNatten, Esq., Allentown, Lehigh County District Attorney's Office, Amy Zapp, Esq., Harrisburg, PA Ofice of Attorney General, for Commonwealth of Pennsylvania.

CASTILLE, C.J., SAYLOR, EAKIN, BAER, TODD, McCAFFERY, and STEVENS, JJ.

## *OPINION*

Chief Justice CASTILLE.

This is a capital appeal from the order of the Court of Common Pleas of Lehigh County denying appellant Harvey Miguel Robinson's first petition for relief under the Post Conviction Relief Act ("PCRA"), 42 Pa.C.S. §§ 9541–9546. For the reasons that follow, we affirm the order of the PCRA court.

## I. *Background*

The facts underlying appellant's conviction and sentence of death are discussed more fully in appellant's direct appeal, *Commonwealth v. Robinson,* 581 Pa. 154, 864 A.2d 460, 471–78 (2004), *cert. denied,*546 U.S. 983, 126 S.Ct. 559, 163 L.Ed.2d 470 (2005) (*Robinson I* ). In order to place appellant's current claims in context, some background is required.

The evidence adduced at trial and summarized more fully in *Robinson I* established that appellant raped and brutally murdered three women in separate incidents over a one-year span. The first rape and murder occurred in early August of

1992, with the dead and battered body of victim Joan Burghardt, who had been dead for some time, found in her apartment in Allentown on August 9. Appellant was seventeen at the time he raped and bludgeoned Ms. Burghardt to death. The second rape and murder occurred in Allentown on June 9, 1993, the victim being fifteen-year old Charlotte Schmoyer, who apparently was abducted while delivering newspapers. Appellant had viciously stabbed the young girl twenty-two times, including at least two wounds up to the hilt of the four-inch knife he used; he then dumped the child's body in a heavily wooded area.[1] A month later, on July 14, 1993, the dead body of Jessica Jean Fortney was found in the bedroom of her home in Allentown. Appellant had raped Ms. Fortney and then beat and strangled her to death.

The three murders were consolidated and tried together before a jury beginning on October 10, 1994. A primary witness for the Commonwealth at trial was Denise Sam–Cali, who had survived a similar rape and murderous assault by appellant in her Allentown home on June 28, 1993. The rape and assault on Ms. Sam–Cali thus took place less than three weeks after the murder of Ms. Schmoyer, and two weeks before the murder of Ms. Fortney. The attack followed a similar trajectory as the other rapes and murders.

Prior to the capital murder trial, appellant pled guilty to three counts of burglary, two counts of attempted criminal homicide, and two counts of firearms not to be carried without a license, relating to the multiple attacks on Ms. Sam–Cali.[2] In November 1994, following the guilt phase portion of the serial murder trial, the jury returned a guilty verdict of first-degree murder for each murder as well as guilty verdicts on all remaining charges. Appellant was represented by Carmen Marinelli, Esquire, at the guilt phase.

1. During part of the time between the first and second murders, appellant was detained in a juvenile placement facility for an unrelated crime. Appellant was eighteen by the time of the murder of Ms. Schmoyer.

2. Appellant had unlawfully entered the Sam–Cali residence on three separate occasions.

The trial then proceeded to the penalty phase and appellant presented testimony from family and friends and the expert testimony of Dr. Robert Sadoff, a forensic psychiatrist. Dr. Sadoff testified that, *inter alia*, appellant had an "anti-social personality disorder." Appellant did not take the stand and testify on his own behalf. Following the presentation of evidence at the penalty phase, the jury found the following aggravating circumstances as to each murder: (1) the killing was committed during the perpetration of a felony, 42 Pa.C.S. § 9711(d)(6); (2) appellant had a significant felony history involving the use or threat of violence, *id.* § 9711(d)(9); and (3) appellant was convicted of another murder before or at the time of the present murder, *id.* § 9711(d)(11). The jury also found the torture aggravator, *id.* § 9711(d)(8), respecting the murders of Ms. Schmoyer and Ms. Burghardt. The jury further concluded that the multiple aggravating circumstances outweighed a single mitigating circumstance it found respecting each case, *i.e.*, the catch-all mitigator under Section 9711(e)(8). The mitigating factors enumerated by the jury to support the catchall circumstance included "family background and environment," "use of alcohol and drugs," and "school history." The jury thus returned verdicts of death for all three murders. The trial court formally imposed the sentences of death on November 29, 1994, and imposed lesser sentences for the non-murder convictions. Appellant was represented by James Burke, Esquire, at the penalty phase.

Philip Lauer, Esquire, and Mary Ennis, Esquire, (hereafter "appellate counsel") were appointed to represent appellant for purposes of post-sentence motions and direct appeal. The death sentences related to the murders of victims Burghardt and Schmoyer were vacated on post-sentence motions, and new penalty hearings were granted as to those murders. The trial court determined that the jury had impermissibly considered the murders of Ms. Schmoyer and Ms. Fortney when finding the (d)(11) aggravating circumstance for the murder of Ms. Burghardt and had impermissibly considered the murder of Ms. Fortney in passing upon the penalty for the murder of Ms. Schmoyer. The Commonwealth did not appeal the grant

of sentencing relief as to these two murders. Appellant filed a direct appeal from his sentence of death for the murder of Ms. Fortney, and our Court consolidated that appeal as of right with the discretionary, interlocutory appeals appellant lodged respecting the murders of Ms. Burghardt and Ms. Schmoyer, with those appeals limited to the guilt phase. *Robinson,* 864 A.2d at 478 n. 25.

On direct appeal, the Court reviewed a number of claims of trial counsel ineffectiveness related to both the guilt and penalty phases of trial, thus affording appellant unitary review. The Court explained that the collateral claims fell within the "narrow exception" to the *Grant* rule (which requires deferral of ineffectiveness claims to PCRA review), which was articulated in *Commonwealth v. Bomar,* 573 Pa. 426, 826 A.2d 831 (2003), because both guilt phase and penalty phase counsel testified on post-sentence motions.[3] Ultimately, the Court affirmed the three first-degree murder convictions and affirmed the judgment of sentence of death related to the murder of Ms. Fortney.[4]

On July 24, 2006, James Moreno, Esquire, of the Philadelphia-based Federal Community Defender Office ("FCDO") filed an "Ex Parte Motion," seeking an order permitting the transport of appellant for an MRI and PET scan. On August 3, 2006, appellant filed a *pro se* petition for PCRA relief. His *pro se* petition stated that he was being represented by

---

3. *Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726 (2002). The continuing vitality and scope of the *Bomar* exception to *Grant* was recently addressed in *Commonwealth v. Holmes,* 621 Pa. 595, 79 A.3d 562 (2013). No issue concerning the *Bomar* exception is presented here.

4. On April 25, 2006, a sentence of life imprisonment was imposed for the murder of Joan Burghardt, no doubt because appellant was under the age of eighteen when he raped and murdered her, and thus the U.S. Supreme Court's decision in *Roper v. Simmons,* 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005), rendered him ineligible for the death penalty because of his age. On December 14, 2012, a sentence of life imprisonment was imposed for the murder of Charlotte Schmoyer. The reason for the six-year lapse of time in the resentencing dates of the two murders was that the Commonwealth pursued a sentence of death for the murder of Ms. Schmoyer until an agreement was reached in late 2012.

Moreno and Rebecca Blaskey, Esquire, also with the FCDO, for purposes of a federal *habeas corpus* petition.[5] A full four years later, on August 2, 2010, the FCDO finally filed a counseled PCRA petition, raising two claims of counsel ineffectiveness related to the penalty phase and a claim that the sentence of death in this case violated the Eighth Amendment. The PCRA court conducted four days of evidentiary hearings during which expert witnesses from both sides testified. Appellant also presented the testimony of his trial counsel, his appellate counsel, Dr. Sadoff, and the brief testimony of John Lesko, another convicted capital murderer who resided on death row in the same prison as appellant for a time. Following the hearing, the PCRA court denied appellant PCRA relief by order dated June 21, 2012. Appellant filed this appeal pursuant to 42 Pa.C.S. § 9546(d).[6]

In the opinion accompanying its order, the PCRA court first addressed appellant's claim that trial counsel were ineffective

5. Appellant filed a premature federal *habeas corpus* action in the U.S. District Court for the Eastern District of Pennsylvania in 2006, and counsel from the FCDO was appointed to represent him on that federal matter. The *habeas* action was stayed pending the outcome of the PCRA proceedings. In 2011, the FCDO sought a brief reactivation of the federal habeas action in order to have FCDO counsel retroactively appointed for purposes of the state court proceedings which were already well under way. On August 29, 2011, the federal court entered an order, which granted the FCDO's request as follows: "[Appellant]'s counsel is directed to exhaust any and all state court remedies expeditiously, effective nunc pro tunc to the date upon which [his] convictions and sentence became final on direct appeal, including exhaustion of [his] federal claims." *See* Order at 2:06–cv–00829 dated 8/29/11. The habeas action was then "returned to the suspense docket...." The federal court order cites no federal statutory authority for appointing federally-financed counsel to litigate PCRA petitions in advance of a federal *habeas corpus* petition; in fact, there is none. *See* 18 U.S.C. § 3599(a)(2) (authorizing appointment of counsel to indigent state defendants actively pursuing federal *habeas corpus* relief from sentence of death); *Harbison v. Bell*, 556 U.S. 180, 129 S.Ct. 1481, 173 L.Ed.2d 347 (2009).

6. FCDO counsel sought and were granted three separate thirty-day extensions of time to file appellant's brief. In each instance, counsel cited to FCDO workload, in either federal court or state court. The Court's third order expressly stated that no further extensions would be granted. The FCDO did not comply with the order, and instead sought a fourth extension, which we did not grant, although we did accept the tardy Brief.

for failing to adequately investigate and present mitigating evidence at the penalty phase of the trial and his derivative, layered claim that appellate counsel were ineffective for failing to raise the issue of trial counsel's ineffectiveness on appellant's hybrid direct appeal. The primary information that was allegedly not obtained by trial counsel (or obtained but not provided to Dr. Sadoff) related to school records. Appellant's theory of collateral attack was that the school records would have demonstrated that in 1981, when appellant was 6, he tested to a full scale IQ of 126, which was in the superior range, but in 1989, when he was 14 and a resident at Harbor Creek (a juvenile placement facility), he tested to a full scale IQ of 100, which is in the average range. Appellant's PCRA experts opined that the difference in the two test results was significant and would have warranted further neuropsychological testing because it suggested possible frontal lobe brain damage. According to appellant's experts, the theory of possible frontal lobe brain damage was further supported by the PET scan and MRI of appellant's brain secured by the FCDO's *ex parte* motion.

The PCRA court reasoned that the issue was without merit because appellant did not credibly prove its necessary factual predicate, *i.e.,* that trial counsel failed to obtain and provide appellant's school records to Dr. Sadoff. The PCRA court explained that resolution of the issue ultimately came down to a credibility determination between trial counsel's testimony that he had obtained the school records and provided them to Dr. Sadoff and Dr. Sadoff's testimony that it was his practice to record every document he reviewed in preparing his report. Dr. Sadoff further testified that he was "confident" that he did not receive the records because the school records were not listed in his report. As will be addressed more fully below, the PCRA court credited the testimony of trial counsel over that of Dr. Sadoff, thereby determining that appellant did not establish that trial counsel failed to provide the school records to Dr. Sadoff.

Alternatively, the PCRA court reasoned that even if trial counsel had failed to provide the records to Dr. Sadoff,

appellant could not establish prejudice. The court based its finding on the competing testimony of the experts, who testified as to when neuropsychological testing became available and generally accepted for diagnosing brain damage. Much of the relevant testimony centered on the use of PET scans and MRIs for diagnosing brain damage. The PCRA court concluded that, at the time of appellant's trial in 1994, the issues of who should be tested for brain damage, what that testing would actually entail, and understanding the consequences of such results were only in the incipient stage. Furthermore, the PCRA court explained there was some dispute among the proffered experts as to whether the drop in IQ reflected in the two test scores was indicative of possible brain damage, or whether the decrease was attributable to external factors other than brain damage. In any event, the PCRA court was ultimately persuaded that appellant could not establish that the outcome of the penalty proceeding would have been altered given the magnitude of his crimes. The PCRA court summarized its rejection of this ineffectiveness issue as follows:

In sum, [appellant]'s claim for relief hinges on the drop in his IQ scores between 1981, when he was six years old, and 1989, when he was fourteen years old. Although all experts agree to some extent that this diminution is "significant," the "low" score of 100 may have been caused by external factors, such as a poor education, during the intervening period as opposed to some cognitive impairment of [appellant]'s brain. In any event, even the score of 100 indicates a "normal" brain. Under those circumstances, it cannot be said that Dr. Sadoff, an experienced clinical psychiatrist, should have referred [appellant] for additional testing, much less that trial counsel was somehow ineffective for relying on Dr. Sadoff. Nor has it been established that the brain imaging studies subsequently used by [appellant's expert] in his evaluation of [appellant], would have been available to test and diagnose [appellant] in 1994 even if a consensus regarding a diagnosis does exist under present day standards. More to the point, in view of the overwhelming

weight of the aggravating circumstances in this case, in the form of brutal serial rape and murder, and in light of the credible expert witness testimony presented by the Commonwealth regarding [appellant]'s manifest ability to utilize executive brain function to carefully plan and execute these crimes, there is no probability that the calculus of any reasonable juror would have been altered by the claims of front lobe impairment upon which [appellant] now bottoms his argument.

PCRA court opinion, 6/21/12, at 17–18.

The PCRA court did not separately address appellant's second claim that trial counsel was ineffective for presenting evidence of antisocial personality disorder to the jury via Dr. Sadoff. Rather, in discussing the first issue, the court noted that trial counsel had testified that he was aware that the diagnosis would come out on cross-examination, and so he determined to deal with it "proactively in the full context of Dr. Sadoff's professional medical explanation." Furthermore, according to the court, it was the only potentially mitigating factor "from a diagnosis perspective" that trial counsel possessed. *Id.* at 7–8.

The PCRA court then addressed appellant's claim that the Eighth Amendment prohibits the imposition of a death sentence on a brain-damaged individual, by footnote. The court concluded that appellant waived the issue because it was not advanced in his brief. Alternatively, the court dismissed the claim "out of hand" because appellant's mental condition did not place him in the category of persons for whom capital punishment was constitutionally prohibited. *Id.* at 18 n. 3 (and citing *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)).

 In reviewing the denial of PCRA relief, we examine whether the PCRA court's determination "is supported by the record and free of legal error." *Commonwealth v. Rainey*, 593 Pa. 67, 928 A.2d 215, 223 (2007). To be entitled to PCRA relief, appellant must establish, by a preponderance of the evidence, that his conviction or sentence resulted from one or

more of the enumerated errors in 42 Pa.C.S. § 9543(a)(2), his claims have not been previously litigated or waived, and "the failure to litigate the issue prior to or during trial ... or on direct appeal could not have been the result of any rational, strategic or tactical decision by counsel." *Id.* § 9543(a)(3), (a)(4). An issue is previously litigated if "the highest appellate court in which [appellant] could have had review as a matter of right has ruled on the merits of the issue." *Id.* § 9544(a)(2). An issue is waived if appellant "could have raised it but failed to do so before trial, at trial, ... on appeal or in a prior state postconviction proceeding." *Id.* § 9544(b).

In order to obtain relief on a claim of ineffectiveness, a PCRA petitioner must satisfy the performance and prejudice test set forth in *Strickland v. Washington,* 466 U.S. 668, 687, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984). In Pennsylvania, we have applied the *Strickland* test by looking to three elements: the petitioner must establish that: (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's actions or failure to act; and (3) the petitioner suffered prejudice as a result of counsel's error, with prejudice measured by whether there is a reasonable probability that the result of the proceeding would have been different. *Commonwealth v. Pierce,* 515 Pa. 153, 527 A.2d 973, 975 (1987). Additionally, we note, the Sixth Amendment right to counsel is recognized "not for its own sake," but because of the effect it has on the accused's right to a fair trial. *See Lockhart v. Fretwell,* 506 U.S. 364, 369, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993); *see also Strickland,* 466 U.S. at 689, 104 S.Ct. 2052. Furthermore, counsel is presumed to have rendered effective assistance. Both the U.S. Supreme Court and this Court have made clear that a court is not required to analyze the elements of an ineffectiveness claim in any particular order of priority; if a claim fails under any necessary element of the *Strickland* test, the court may proceed to that element first. *Strickland, supra; Commonwealth v. Albrecht,* 554 Pa. 31, 720 A.2d 693, 701 (1998). Additionally, counsel obviously cannot be deemed ineffective for failing to raise a meritless claim. *Commonwealth v. Jones,* 590 Pa. 202, 912 A.2d 268, 278 (2006).

Finally, as appellant was permitted to litigate claims of trial counsel ineffectiveness on post-verdict motions and on direct appeal, to secure relief on his new, underlying claims of trial counsel ineffectiveness, he must demonstrate not only that trial counsel was ineffective, but that appellate counsel were ineffective for failing to raise the claims on post-verdict motions and on his hybrid direct appeal. In short, appellant's ineffectiveness claims deriving from trial counsel's performance are cognizable only as "layered" claims. To secure relief as to these claims, appellant must plead and prove *Strickland/Pierce* ineffectiveness as to each relevant layer of representation as explained by *Commonwealth v. McGill*, 574 Pa. 574, 832 A.2d 1014, 1023 (2003). *See also Commonwealth v. Ali*, 608 Pa. 71, 10 A.3d 282, 292 (2010).

We now address appellant's claims.

## II. Ineffective Investigation and Presentation of Mental Health Evidence

### A. *Parties' Arguments*

Appellant first alleges that trial counsel was ineffective nearly twenty years ago for failing to investigate and present what he claims was "readily available" evidence of frontal lobe and parietal brain damage. Appellant argues that penalty phase counsel was inexperienced and had not tried a capital case, or any murder case, before. This inexperience, he says, was highlighted by the fact that Dr. Sadoff was not contacted until fourteen days before trial. Furthermore, appellant argues that more experienced trial counsel in 1994 would have known that Dr. Sadoff's diagnosis of antisocial personality disorder was not a mitigating factor.

Notwithstanding the PCRA court's credibility findings, appellant also alleges that trial counsel failed to provide relevant school records to Dr. Sadoff. The records, he says, would have shown a significant drop in appellant's performance on IQ tests between the ages of six and fourteen (a twenty-six point testing decrease overall and a forty-two point decrease in verbal performance), as measured by IQ tests administered

at those ages. Appellant notes that Dr. Sadoff testified that, if he had been provided such records, he would have recommended that appellant be tested for potential brain damage.

In a further challenge to the PCRA court's finding that counsel in fact provided the school records to Dr. Sadoff, appellant notes Dr. Sadoff's generic testimony that it was his practice to list all documents and records received from trial counsel and that he did so in this case. The relevant school records (from Allentown School District and Harbor Creek juvenile placement facility), however, were not listed, and thus, Dr. Sadoff testified that he did not receive these records. Appellant avers that trial counsel was unable to produce a cover letter indicating what documents he sent to Dr. Sadoff and trial counsel stated that he would have had no strategic reason for not providing the records to Dr. Sadoff. Appellant next looks back twelve years to trial counsel's testimony during post-sentence motions, claiming that counsel then disavowed any reliance on school records because they would have opened the door to damaging rebuttal testimony. Appellant speculates from the reasoning of trial counsel at postsentence motions that he did not provide the records to Dr. Sadoff for fear that the records would ultimately have to be disclosed to the Commonwealth. Appellant then notes that, at trial, trial counsel stated that Dr. Sadoff was "basing his diagnosis, your Honor, on his interviews and evaluations of [appellant] independently of the medical records." N.T., 11/9/94, at 2544. Appellant contends that this statement was consistent with Dr. Sadoff's PCRA recollection that no records were provided to him and was inconsistent with trial counsel's PCRA testimony.

Appellant next asserts that evidence of brain damage is widely recognized as mitigating evidence and trial counsel would have had no reasonable basis for failing to present such evidence. Similarly, appellant argues that if counsel had thoroughly reviewed the records provided to him, he would have noticed the decrease in performance on the two IQ tests and reasonable counsel would have questioned the import of the decrease. Appellant also argues that a competency evalu-

ation of appellant conducted by Paul Gross, M.D., prior to trial raised "doubts" as to appellant's mental stability, yet trial counsel failed to raise the issue with Dr. Sadoff.

Appellant then contends that trial counsel's alleged failures prejudiced him because the jury was never presented with evidence of his allegedly severe brain damage. Instead, the jury was presented with very limited testimony about appellant's drug and alcohol dependence and harmful evidence of his antisocial personality disorder. Appellant believes that there is a reasonable probability that evidence of brain damage would have persuaded at least one juror to find a mental health mitigating circumstance pursuant to Section 9711(e)(3), which would have altered the outcome of the proceedings, even in the context of this triple rape and murder.

Appellant acknowledges that appellate counsel conducted their own investigation for purposes of post-verdict motions and direct appeal and presented evidence of appellant's good character from a variety of friends and family members in an attempt to prove that trial counsel was ineffective. However, appellant argues that counsel admitted that they did not contact Dr. Sadoff or conduct any investigation into appellant's mental health history and further acknowledged that they did not have any strategic reason for failing to conduct such an investigation.

Appellant also responds to the PCRA court's conclusion that neuropsychological testing was not in wide use at the time of his trial. Appellant avers that the court conflated neuroimaging and neuropsychological testing. Appellant offers that neuropsychological testing was widely used in 1994; the battery of neuropsychological tests administered to him in 2009, he says, were also used in 1993 and 1994. Additionally, although appellant's 1989 IQ test result of 100 might be in the "normal" range, he says the pertinent question is whether the 26 point drop in test scores between 1981 and 1989 was significant and Dr. Sadoff testified that the decrease indicated a need for neuropsychological testing.

The Commonwealth responds that resolution of this issue is straightforward. The PCRA court found the testimony of trial counsel more credible and reliable than that of Dr. Sadoff. The Commonwealth argues that the credibility determinations made by the PCRA court were based on observations and review of the relevant evidence, which "must" be accepted by this Court. Furthermore, the Commonwealth contends that appellant's speculation that trial counsel chose to withhold the records from Dr. Sadoff because he feared that they would be disclosed to the Commonwealth, and then misrepresented the facts at the PCRA hearing, is unfounded; this Court should not use a speculative argument to establish a finding of ineffectiveness. The Commonwealth reiterates that this issue presented a question of credibility and the PCRA court's determination is supported by trial counsel's testimony and the report of Dr. Sadoff. On the latter point, the Commonwealth explains that Dr. Sadoff's report states that he "reviewed the records that [trial counsel] provided, *including* the following" and then enumerates the documents he reviewed. According to the Commonwealth, the use of "including" suggests that Dr. Sadoff possessed more documents than were enumerated in the report.

Additionally, the Commonwealth asserts that the experts' testimony offered during the PCRA hearings confirmed that appellant was of average intelligence and displayed signs of antisocial personality disorder. Such testimony further corroborates that Dr. Sadoff had the relevant information, but concluded that further testing was not warranted.

The Commonwealth next argues that, even assuming appellant may be able to establish that he had brain damage at the time of the PCRA hearings, there is no way to conclude that such damage existed at the time of the murders or how the damage affected appellant at the time of the crimes. Furthermore, the Commonwealth avers that appellant's expert testimony never established a correlation between the decrease in IQ reflected in the two tests and the frontal lobe damage; IQ testing is not sensitive to frontal lobe damage. Instead, the Commonwealth argues that the nature of the crimes them-

selves show an actor who possessed sufficient executive functioning to stalk his victims and plan and carry out the sexual assaults and murders.

The Commonwealth does not directly address appellant's claim that neuropsychological testing was generally available, *i.e.*, the battery of tests used to determine brain damage, but instead argues that neuroimaging (*i.e.*, the use of a PET scan to determine brain damage) was not widely available in 1994. According to the Commonwealth, this lack of availability undermines the opinion of appellant's expert, Dr. Ruben Gur (PhD), which was based, in part, on the results from the neuroimaging tests. Alternatively, the Commonwealth argues that even if neuroimaging was available, its application for forensic purposes was extremely limited. In fact, the Commonwealth argues that it presented testimony that the common wisdom in 1994 was that neuroimaging should not be used to predict or explain a particular person's behavior. Finally, the Commonwealth avers that none of appellant's experts specifically related their findings of brain damage to explain appellant's serial murderous behavior in 1992–93.

### B. *Testimony at PCRA Hearing*

Appellant's penalty phase counsel testified regarding the school records. He stated that he "acquired [the records] by subpoena, with personal service to all of the record keeping entities. I remember physically driving to them. [The Allentown school district office] was conveniently located across the street for me, so I was able to go over there. I acquired them all through subpoena." Counsel then stated that he believed Dr. Sadoff "had to have all of those items." He acknowledged that he did not have a cover letter in his files reflecting that the records were sent to Dr. Sadoff. Respecting the fact that the school records were not enumerated in the report authored by Dr. Sadoff, counsel said that there was no reason that he would have bothered obtaining all of the records and not provided them to Dr. Sadoff. Counsel stated: "It just would have—It would have been absurd."

Respecting appellant's antisocial personality diagnosis, counsel explained that the information was "coming out anyway," so he had to address it. And, counsel added, Dr. Sadoff's testimony was used to synthesize the background of appellant's life "and that's why—There is no way he didn't have those records." On cross-examination, counsel again testified that he recalled obtaining the school records. Ultimately, he testified unequivocally that, "I know we gave it to him. I will swear, you know, on a stack of [B]ibles that it was given to him.... I can't speak for why he lists it this way [on his report], but there is no way on earth he didn't have this stuff. He was only—That was the only reason we retained him, really." N.T., 12/17/10, at 30, 32, 36, 55–56, 61.

Guilt phase counsel also briefly testified. He corroborated that the defense obtained the juvenile and school records. He also testified that while he did not recall the specific records that were provided to Dr. Sadoff, "we provided everything that they gave us [to Dr. Sadoff]." *Id.* at 99, 103.

Appellate counsel testified that they did not conduct an independent mental health investigation, or contact Dr. Sadoff, and that they had no "strategic" reasons for not doing so. However, they further testified that, in preparing their claim of trial counsel ineffectiveness, if they had seen something in the records that alerted them to possible brain damage or other mental health mitigation evidence, they would have acted on it. Counsel testified that they focused on finding mitigating evidence to "humanize" appellant and therefore focused their efforts on positive mitigating evidence from friends, family members, and people who supervised appellant in school. *Id.* at 151–55, 159–60 (testimony of Mary Ennis, Esquire), 176–83 (testimony of Philip Lauer, Esquire).

Dr. Sadoff explained that the use of the word "including" in his report in reference to the records may have been "confusing to some people. What I meant to say was, these are the records that you provided.... And these are all of the records that I had.... There would be no reason for me not to include any other records that were sent to me." He further testified that it was his practice in 1994 to list all of the documents that

he reviewed in preparing his report. Dr. Sadoff insisted that he did not have the relevant records and that if he had had information showing a decrease in IQ testing scores he would have recommended further testing. On cross-examination, Dr. Sadoff admitted that he had no independent recollection of the records he reviewed in preparing his report, but instead was relying on the records that were enumerated in the report. He then stated he was "one hundred percent positive" that he did not review the school records, because of his habit of listing all of the documents he reviewed "with every case I have. And there would be no reason for me to omit other reports or documents that I had reviewed."

Dr. Sadoff further testified that he did not consider IQ a factor prior to trial because, when he interviewed appellant, appellant "appeared fairly bright to me when I talked to him, articulate, knew these subtle differences, as you point out, in the law...." On redirect, he reiterated that if he had the school records reflecting a decrease in IQ test scores, he would have asked for more information and done "at least a screening test on organic brain damage." Furthermore, he testified that people can be brain damaged and still be intelligent. The court then independently questioned Dr. Sadoff about the school and juvenile placement records. Dr. Sadoff testified that he was aware that appellant was at St. Gabriel's, but he did not have the records and he was unsure whether he asked counsel for the records. Finally, he stated "[f]or what I had, I thought I had enough. Had I had more, I might have asked for more. But with what I had, I must have concluded it was sufficient for me to at least give these diagnoses and recommendations." N.T., 12/20/13, at 16–17, 21–26, 32, 35, 51, 60, 67–68.

Appellant produced testimony from two additional mental health experts at the PCRA hearing. Dr. Gur is a licensed psychologist with a subspecialty of clinical neuropsychology, who did not meet personally with appellant but reviewed a comprehensive neurofunctional evaluation, analysis of behavioral findings, and MRI and PET scan results of appellant's brain. Dr. Gur opined that the neuropsychological testing

(conducted by a different doctor who did not testify) revealed brain damage to the frontal lobe of the brain. He further opined that people with frontal lobe damage have "deficits in executive functioning," and the damage prevents the person "from seeing the big picture," *i.e.,* the person wants to do something detrimental and is not able to suppress the urge. Dr. Gur then compared his results with the results reached by Dr. Daniel Martell (discussed below) and found them to be very similar. Dr. Gur further testified that the results from the neuropsychological testing was consistent with the brain damage observed in the MRI and PET scan testing. He separately stated that neuroimaging was available prior to 1994. He reiterated that frontal lobe damage will result in deficits in initiating and inhibiting responses, cognitive flexibility, discovering rules, planning, judgment, and high level problem solving.

On cross-examination, the Commonwealth asked Dr. Gur whether the brain damage he detected could have been sustained during a 2006 assault when appellant was incarcerated. (Both appellant and the Commonwealth introduced testimony regarding an attack on appellant that occurred in the prison and resulted in a head injury, the severity of which was disputed, and a spinal injury.) Dr. Gur testified that the assault could not have caused the brain damage reflected in the test results. Instead he believed the brain damage occurred gradually, and prior to the 2006 assault, and was reflected by the significant decrease in appellant's IQ as measured in the two school tests. *Id.* at 147–48, 166–67, 180–81, 190–91, 204–05.

Dr. Daniel Martell testified that he has a PhD in psychology and specializes in forensic psychology. He met with appellant for a total of seven hours over a two-day period at SCI–Graterford, and reviewed the other experts' reports as well as appellant's school records. He also conducted an independent evaluation of appellant, administering a battery of psychological tests. Dr. Martell opined that the testing revealed frontal lobe brain damage and that most of the damage involved the forward part of the lobes, "the areas that control impulse

control, organization and control of behavior, the ability to learn from mistakes, the ability to switch between competing stimuli." Dr. Martell discussed the "significant" decrease in IQ represented in the two test scores, expressing "shock" that it was not addressed. He acknowledged that an IQ of 100 is in the average range. Dr. Martell also opined that "IQ tests are relatively insensitive to frontal lobe damage." Dr. Martell explained the tests that he administered, testifying that these were the "gold standards" to measure frontal lobe damage. Like Dr. Gur, Dr. Martell did not believe that the brain damage he testified to was attributable to a 2006 head injury, but believed that appellant "has always been this way. I think that something happened in his neuro-development between six and fourteen, that changed the way his brain functions...." Following cross-examination, the court questioned the witness as to appellant's specific impairments. Dr. Martell reiterated that the brain damage he was speaking to impaired executive function and control. Dr. Martell further testified that appellant's IQ of 100 was in the "normal" range and that he was not mentally retarded. N.T., 12/21/10, at 19–20, 36–38, 51, 61, 89–91.

The Commonwealth presented rebuttal expert testimony. Dr. Thomas Swirsky–Sacchetti testified that he has a PhD in psychology and focuses his practice on neuropsychology. Dr. Swirsky–Sacchetti reviewed the other experts' reports, as well as the prior records, school and psychological, of appellant. He testified that PET scans were available in 1994, but that they were not in widespread clinical use. He agreed that the test results showed some mild impairment in appellant's brain, but he did not agree that the impairments were "severe." He further opined that the decrease in appellant's IQ test performance could be attributed to test-taking anxiety and his limited educational opportunities. Dr. Swirsky–Sacchetti also disagreed with Dr. Martell's report, which compared appellant to other people who had completed 12 years of education. In his opinion, Dr. Martell should have compared appellant to people who completed nine years of education. Using that comparison, Dr. Swirsky–Sacchetti explained, appellant's

scores become average or above average. On cross-examination, Dr. Swirsky–Sacchetti testified to factors he believed Dr. Martell did not adequately consider, such as malingering, whether appellant was giving his best effort, and the 2006 injury he suffered. N.T., 12/21/10, at 136, 139, 142–43, 145–48, 176–78, 200–01.

Dr. Timothy Michals, a physician specializing in clinical and forensic psychiatry, also testified for the Commonwealth. Dr. Michals saw appellant on two occasions for evaluation and reviewed all of the experts' reports as well as appellant's school and psychological records. Dr. Michals agreed with Dr. Sadoff's 1994 diagnosis that appellant suffered from anti-social personality disorder and alcohol abuse. He further stated that he would not have referred appellant for more testing in 1994, *i.e.*, neuropsychological testing, even if he had been provided with the school records showing the decreased performance on IQ tests. Like Dr. Swirsky–Sacchetti, Dr. Michals indicated that the change in performance on the IQ test could be attributed to educational factors, appellant's inattention, and home life. He also testified that appellant did not suffer from perseveration.[7] N.T. 12/22/10, at 61–63, 69–71.

Finally, appellant presented rebuttal testimony from Dr. Martell. Dr. Martell explained that he did not dispute that appellant had antisocial personality disorder, but that, in his opinion, appellant had "more going on," *i.e.*, brain damage. He clarified that his belief that appellant suffered from brain damage was based on more than just the decrease in the IQ test results, including the testing that was done in his early life, the learning disabilities, and the history that followed. He further explained that he measured appellant's test results using 12th grade norms because the records showed that

7. The various experts explained that perseveration is the uncontrollable repetition of a response, *i.e.*, getting stuck on a particular word or idea, and can be a symptom of brain injury. The 1981 IQ test suggested the possibility of perseveration, which was seized upon by appellant's experts. Dr. Michals explained that because perseveration was never noted again, he gave it little weight in his report. In his opinion, perseveration was the type of diagnosis that one would expect to see throughout all of the evaluations, if it in fact was present. *Id.* at 63–64.

appellant received a high school diploma from St. Gabriel's (a juvenile placement facility). On cross-examination, Dr. Martell speculated that no prior doctor had diagnosed brain damage because appellant's records did not follow him. Furthermore, Dr. Martell admitted that appellant demonstrated some executive functioning as he planned for post-graduation by applying to a technical school. *Id.* at 155–56, 157, 161–67, 193–94.

## C. *Discussion*

■ The primary underlying issue before the Court is the decrease in appellant's IQ as reflected by school records recording his performance on IQ tests in 1981 and 1989, and whether this testing decrease signaled the need for neuropsychological testing which, in turn, would have revealed brain damage (be it mild or severe) that could have served as a basis for the development of additional mitigation evidence. Although appellant makes a passing argument that counsel should have recognized that the IQ scores could be significant to Dr. Sadoff's evaluation, penalty phase counsel was not a psychiatrist or mental health expert, nor was he required by the Sixth Amendment to be one. *See Commonwealth v. Lesko*, 609 Pa. 128, 15 A.3d 345, 382 (2011) (and discussed *infra*). Rather, the relevant allegation, in this layered Sixth Amendment claim, is that counsel allegedly failed to provide his mental health expert, Dr. Sadoff, with "red flag" style information that the expert would have recognized warranted neuropsychological testing. The factual question of whether counsel obtained the school records and provided them to Dr. Sadoff was specifically disputed below. If counsel in fact obtained and provided the records to Dr. Sadoff, and Dr. Sadoff's expert review provided counsel with no basis upon which to pursue mental health mitigation evidence further, appellant cannot prove counsel's ineffectiveness.

This case is unlike many other capital PCRA matters involving allegations of an ineffective failure to investigate, because here there is no doubt that penalty phase counsel obtained the school records. Counsel so testified at the PCRA hearing,

and his account was consistent with his post-trial testimony more than ten years earlier. Counsel specifically remembered walking across the street to obtain the Allentown School District records and expressed a similarly clear recollection with regard to obtaining the other school records, including the records from Harbor Creek. N.T., 11/13/98, at 7–8. The critical factual inquiry before the PCRA court was whether counsel provided the records to Dr. Sadoff.

The PCRA court, which had the opportunity to hear both penalty phase counsel and Dr. Sadoff testify, and observe their respective demeanors, specifically credited the testimony of penalty phase counsel over that of Dr. Sadoff. The PCRA court further explained that counsel's recollection was more specific and was supported by his testimony regarding his strategy at the penalty phase. The PCRA court noted that counsel's belief that Dr. Sadoff's role as an impartial expert was critical to mitigation lent credibility to counsel's statement that there was no reason why he would have obtained the records and not provided them to Dr. Sadoff. The PCRA court also found that penalty phase counsel "convincingly" testified that if Dr. Sadoff had suggested further testing, he would have pursued it since this was precisely the type of guidance he was seeking from his expert. But, no person, including Dr. Sadoff, ever suggested that further testing was warranted. In contrast to counsel's testimony, the PCRA court noted that Dr. Sadoff "had no independent recollection" of whether he had received the school records, but instead relied solely on the absence of a reference to school records in his report. The PCRA court also emphasized that Dr. Sadoff's report stated that he had reviewed records, "including the following," which left open the possibility that he had reviewed additional records that were not listed in his report. Although Dr. Sadoff attempted to explain that notation, the PCRA court was not obliged to credit the explanation. Finally, the PCRA court noted that Dr. Sadoff testified that he normally requested all relevant records and it seemed likely "that he would have requested" the school records at issue here, "or at least made a note regarding any gaps or omis-

sions." PCRA court opinion at 10. To the PCRA court's specific explanation may be added the fact that guilt phase counsel corroborated that the defense had given all of the records they had to Dr. Sadoff.

■ It is well-settled that a PCRA court's credibility determinations are binding upon an appellate court so long as they are supported by the record. *Commonwealth v. Philistin*, 617 Pa. 358, 53 A.3d 1, 25 n. 17 (2012). In this case, the PCRA court had to make a credibility determination between penalty phase counsel's forceful and repeated assurances that he provided the records to Dr. Sadoff and Dr. Sadoff's declarations that he could not have been provided the records because he always listed all of the records he reviewed in preparing his report for trial, and he did not list school records here. The PCRA court ultimately credited counsel's testimony over that of Dr. Sadoff, and explained why. The record supports the credibility determination of the PCRA court, and we cannot disturb the finding.

Appellant nevertheless attacks the PCRA court's factual determination, on two main grounds. First, appellant argues that counsel's declared strategy at the PCRA hearing does not match the strategy he actually pursued during the penalty phase. Appellant specifically takes issue with counsel's testimony that his penalty phase strategy was to put Dr. Sadoff's antisocial personality disorder diagnosis in context to show that, had appellant been properly treated for the disorder, the crimes may never have happened. According to the PCRA court, this declared strategy supported counsel's assurances that he provided the school records to Dr. Sadoff because he wanted to find anything in appellant's history to give context to appellant's actions. Appellant now argues that counsel never pursued such a strategy at trial and, in fact, admitted that appellant was to blame for the crimes he committed.

Appellant's present attenuated theory may have been a matter upon which to challenge trial counsel at the PCRA hearing, but it provides no basis to set aside the PCRA court's credibility determination respecting whether the school rec-

ords were turned over to Dr. Sadoff. In any event, the theory is dubious. At trial, penalty phase counsel presented testimony from a friend of appellant and four of appellant's family members, who testified that they did not believe appellant was guilty of the murders. They also testified that he was both "normal" and a loyal friend. Dr. Sadoff testified, opining that appellant suffered from antisocial personality disorder and alcohol abuse, as discussed above. Appellant declined to testify on his own behalf, as was his exclusive right, even though counsel had "begged" him to testify. N.T., 11/24/98, at 193. Thus, penalty phase counsel had little material to work with when presenting mitigating evidence on appellant's behalf, all in the face of a series of powerful aggravating circumstances.

Even faced with this limited evidence, the jury found the catchall mitigating circumstance, citing multiple factors counsel had stressed: "family background and environment," "use of alcohol and drugs," and "school history." Additionally, and contrary to appellant's argument, it is clear from his closing argument that counsel made use of the antisocial personality disorder diagnosis to explain the "sum total of a life, sum total of a life spent in the bowels of society; the sum total of a life with an abusive alcoholic father." In pleading for his client's life to be spared to serve life in prison, counsel stressed that appellant could be treated in prison for his disorder and that the jury could "let him go join the fraternity of other antisocial personality disordered people." Counsel also argued to the jury that appellant's antisocial personality disorder was never addressed before his crimes; it was not diagnosed and was not treated and, counsel stated, "this man's background, this man's past, has caused this man, as he sits before you here today, to be what he is." N.T., 11/10/94, at 2716, 2717, 2727, 2729. Counsel's closing demonstrates that he pursued a strategy to give context to appellant's actions, which was consistent with his testimony before the PCRA court. The strategy may have failed, but this was hardly surprising given the fact of the serial rapes and murders, the additional attack on Ms. Sam–Cali, and the presence of multiple statutory aggravators. The

record supports that the strategy declared at the PCRA hearing was the one that counsel actually pursued; and this, in turn, undercuts appellant's hindsight theory. Accordingly, appellant's first attack upon the court's credibility determination fails.

Second, appellant notes that during trial, counsel stated that Dr. Sadoff's opinion was based solely on his interviews and evaluations of appellant, independent of any medical records. Appellant speculates that limiting Dr. Sadoff's access to the school records would have been consistent with counsel's understanding that providing the records to Dr. Sadoff risked opening the door to Commonwealth questioning about the school records, which painted a very damaging picture of appellant. Furthermore, according to appellant, counsel's testimony during the post-verdict evidentiary hearing demonstrated that he did not want to use the school records because they would open the door to negative evidence. N.T., 11 /13/98, at 30; 11 /24/98, 186. Appellant also notes that, during trial, the trial judge was clear that any of the records reviewed and relied upon by Dr. Sadoff in making his diagnosis would be open to use by the Commonwealth. Based upon this evidence, appellant argues that counsel's testimony that he provided the records to Dr. Sadoff is unsupported by the record.

As with his first argument, this theory was one for appellant to pose to the PCRA court, in the hope that the court would credit Dr. Sadoff's account over that of trial counsel, an account which itself was corroborated by co-counsel. It is no basis upon which this Court can set aside the PCRA court's credibility determination. Moreover, we are disinclined to credit the suggestion that a member of the bar should be deemed to have misrepresented the facts, under oath, when the accusation, as here, is based entirely upon speculation. The fact that penalty phase counsel wanted to limit the damaging information that was presented to the penalty phase jury does not ineluctably mean that he limited Dr. Sadoff's access to this information, much less that he falsified testimony under oath by testifying that he had provided the records.

At trial, which was after Dr. Sadoff had received the materials from counsel and reached his conclusions, the court stated that any records "relied upon" by Dr. Sadoff would be made available to the prosecution. N.T., 11/9/94, at 2542. Nothing in this scenario contradicts counsel's assurances that the school records were provided to Dr. Sadoff. It is likely that Dr. Sadoff reviewed the records and determined that they did not reveal anything that he had not already diagnosed based on his evaluations and interviews with appellant, *i.e.,* antisocial personality disorder. Thus, if speculation is to be indulged, as appellant would have us proceed, it is logical that the records were not referred to in Dr. Sadoff's report (even though he was given them) because they did not add anything to his diagnosis, and he failed in his usual practice of tracking all that was provided to him. Again, Dr. Sadoff had no recollection specific to this case. Accordingly, appellant's theories do not establish that the PCRA court's credibility determinations are unsupported by the record.

Appellant's alternative argument that trial counsel was ineffective for failing to independently recognize possible mental health issues arising from the decrease in appellant's scores on the two IQ tests, as well as the competency evaluation by Dr. Gross also fails. In light of the PCRA court's supported credibility determination that the records were provided to Dr. Sadoff, and Dr. Sadoff's unquestioned expertise, the Court would be hard pressed to fault trial counsel for failing to perceive a mental health "red flag" when the same information did not raise a red flag with the expert hired specifically for that purpose. This Court has made clear that in applying *Strickland,* courts must be careful not to conflate the roles and professional obligations of lawyers and experts, and cannot demand that counsel, who otherwise act reasonably (as, for example, by hiring a mental health expert), recognize psychological "red flags." *See Lesko,* 15 A.3d at 382. Appellant makes a bald assertion that counsel should have pointed out the decrease in the childhood IQ scores to his expert, but never explains why this should have raised a "red flag" to a lawyer, who is unschooled in mental health matters.

Accordingly, the Court is bound by the supported determination that appellant's trial counsel provided the school and juvenile placement records to Dr. Sadoff. Appellant's claim that trial counsel was ineffective lacks merit, and the derivative claim of appellate counsel ineffectiveness likewise fails.

■ Alternatively, even assuming that counsel did not furnish the records to Dr. Sadoff and that appellant proved the performance prong of *Strickland,* we see no error in the PCRA court's conclusion that appellant has not established prejudice.[8]

■ *Strickland* prejudice in this instance requires the defendant to prove a reasonable probability that, but for counsel's alleged lapse, the result of the penalty proceeding would have been different—here, that appellant would have received a life sentence. Additionally, prejudice must be analyzed in the context of the case, taking into account the developed penalty phase facts. *Lesko,* 15 A.3d at 383–85 (Pa.2011) (citing, in relevant part, *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052). Ultimately, a reviewing court must assess the reliability of the proceedings and ask whether "the result of the particular proceeding [was] unreliable because of a

---

**8.** The PCRA court's tangential observation respecting the availability of neuroimaging in 1994 indeed did not consider whether neuropsychological testing was available, as appellant notes. Given that the court's primary finding respecting the delivery of the records to Dr. Sadoff was supported, however, that error is of no moment.

In any event, we note that, as frequently seems to be the case with mental health experts, the experts expressed disagreement over the significance of a decrease in IQ testing scores as a "red flag" that would have placed an expert on notice that further neuropsychological testing was warranted. Drs. Sadoff and Martell suggested that the decrease in performance in the second IQ test would have indicated further testing, but the Commonwealth's experts explained that such a decrease could be attributed to external factors, such as appellant's educational experience, given that he was inattentive in school and placed in special classes because of his behavior, and his desire to perform on the test. Additionally, all of the experts generally agreed that IQ is not necessarily an indicator of brain damage. Given its mistaken focus on neuroimaging, the court below did not resolve this dispute; but, as noted, that error is of no moment given that the predicate fact necessary to make this second step relevant was not established.

breakdown in the adversarial process that our system counts on to produce just results." *Id.* at 383. Preliminarily, we note that the Court has recognized that a defendant convicted of multiple murders has a difficult task in establishing that he was prejudiced by counsel's failure to adequately investigate and present evidence in mitigation. *See Commonwealth v. Sepulveda,* 618 Pa. 262, 55 A.3d 1108, 1131 (2012); *Lesko,* 15 A.3d at 383–85 (citing, in relevant part, *Strickland,* 466 U.S. at 694, 104 S.Ct. 2052). *Accord Commonwealth v. Gibson,* 610 Pa. 332, 19 A.3d 512, 531 (2011).

In this case, even assuming that the evidence of brain damage (whether mild or severe) that appellant marshaled for PCRA review would have led his jury to find a second mitigating circumstance, *see* 42 Pa.C.S. § 9711(e)(3) (ability of the defendant to appreciate the criminality of his conduct or to conform his conduct to the requirements of the law was substantially impaired), appellant must still establish, within a reasonable probability, that at least one juror would have found that the mitigating circumstances outweighed the aggravating circumstances. We agree with the PCRA court that appellant has not proven *Strickland* prejudice.

This was an extremely difficult case for any attorney. Appellant brutally raped and murdered three women. The jury also heard from the surviving fourth victim, Denise Sam–Cali, who identified appellant as the man who raped and attempted to kill her in the month-long period between appellant's second and third rapes and murders. All of the crimes occurred within a year, and in the same general area of Allentown. One of the murders involved a fifteen-year-old girl. The jury found appellant guilty of all charges, including the three murders. Thus, before the penalty phase began, the jury knew that appellant was a serial rapist and killer, a member of one of the most dreaded and notorious classes of killers in today's society.

During the penalty phase that followed, the jury had available to it not only the grisly facts surrounding the serial rapes and murders and the assault on Denise Sam–Cali, but was also presented with evidence related to appellant's assault on a

school teacher, which was introduced to establish the separate significant felony history aggravator. Thus, the evidence of the murders of Ms. Burghardt and Ms. Schmoyer, as well as the two assaults, provided evidence supporting the jury's determination that appellant had a significant history of violent felonies. Additionally, the jury was presented with evidence, and ultimately found, that two of the murders involved the aggravating circumstance of torture.

On the other side of the equation is the mitigator the jury already found, while still returning three death sentences, now supplemented by appellant's proffer respecting brain damage. Notably, however, any defense expert testimony as to brain damage would have been subject to cross-examination and rebuttal, which may have undermined or diminished the force of the mitigation, as demonstrated by the counter-testimony offered by the Commonwealth at the PCRA hearing. Within this context, we see no error in the PCRA court's finding that there was not a reasonable probability that expert opinion evidence respecting appellant's brain damage would have resulted in a different weighing and a different penalty verdict. The aggravating circumstances related to the murder of Jessica Jean Fortney were grievously serious, and embraced the other two rapes and murders and the attack on Ms. Sam–Cali. *See, e.g., Lesko,* 15 A.3d at 383–84 (*discussing Smith v. Spisak,* 558 U.S. 139, 154–55, 130 S.Ct. 676, 175 L.Ed.2d 595 (2010) and expressing that where there is substantial aggravating evidence it may be particularly difficult to prove *Strickland* prejudice based on potential mitigation evidence submitted on collateral review); *see also Gibson,* 19 A.3d at 531. This is not a case where a verdict of death was only sufficiently supported by the record; the death sentence for murdering Ms. Fortney was imposed with "overwhelming record support." *See Lesko, supra.* Accordingly, appellant has not established that he was prejudiced by any alleged failure of trial counsel in this regard. For this independent reason, his derivative Sixth Amendment claim as to appellate counsel also fails.

### III. Alleged Ineffective Assistance for Presenting Evidence of Appellant's Antisocial Personality Disorder

Appellant next argues that penalty phase counsel was ineffective for allegedly presenting evidence of appellant's antisocial personality disorder as a mitigating circumstance. According to appellant, the evidence was not mitigating, but aggravating. Appellant avers that a person with antisocial personality disorder commits crimes; he declares that presenting such evidence was "disastrous" to the defense. Appellant notes that during the PCRA hearings both Drs. Sadoff and Michals testified that antisocial personality disorder is not mitigating. Appellant further contends that the only strategy offered by counsel was that he "had no other factors" to present. N.T., 12/17/10, at 40. According to appellant, counsel's explanation did not justify presenting to the jury evidence of a diagnosis that reinforced appellant's long criminal history and record of violence. Appellant also contends that it is revealing that the trial court declined to instruct the jury that antisocial personality disorder was not a mitigating circumstance. Appellant cites capital cases from other courts, indicating that the diagnosis is not mitigating, but is damaging to the defense. Finally, appellant argues that the testimony prejudiced him, since it might have reinforced in the minds of the jurors that he was an out of control individual who was dangerous and beyond redemption. Appellant concludes that the evidence undermined the weight of the mitigating evidence that was presented.

The Commonwealth avers that at the PCRA hearing, Dr. Sadoff admitted that "people are still writing about [the diagnosis] as a mitigating factor in death penalty cases." Commonwealth's Brief at 36 (quoting N.T., 12/20/10, at 29–30).[9] The Commonwealth then notes that the evidence was

9. However, the quoted portion of Dr. Sadoff's testimony, viewed in context, tends to support appellant's argument that Dr. Sadoff's opinion was that the diagnosis is not mitigating. Dr. Sadoff stated that he did not "know that [the diagnosis] is [mitigating].... Usually today, however, it's not. Although people are still writing about it as a mitigating factor in death penalty cases." *Id.*

presented in the context of appellant's family background and the jury found that circumstance to be a mitigator. The Commonwealth then quotes penalty phase counsel's testimony at the PCRA hearing, asserting that penalty phase counsel developed a strategy to "lessen the blow" of the diagnosis. Finally, the Commonwealth argues that appellant cannot establish prejudice.

Appellant's argument, conveniently enough, completely ignores penalty phase counsel's explanation for presenting Dr. Sadoff's testimony. Counsel was aware of the potentially damaging nature of the testimony, but counsel also believed that if he did not provide Dr. Sadoff's diagnosis to the jury, the Commonwealth would have.[10] Counsel further explained that he wanted Dr. Sadoff to testify so the jury would hear an "outside, impartial voice:" "[Dr. Sadoff] was going to synthesize much of the background of [appellant]'s life, and also explain it to the jury." Additionally, counsel believed the diagnosis would explain appellant's life circumstances and his reaction to those circumstances, which made it one part of the broader picture that was appellant's life. In counsel's view, the diagnosis was only one facet of appellant's life history, which also included his impoverished background, his lack of appropriate role models, and his drug and alcohol abuse. N.T., 12/17/10, at 36, 42, 46–47.

The PCRA court, which did not address the claim at length, credited counsel's explanation, noting that trial counsel was aware that the diagnosis would be revealed on cross-examination, and so he determined to deal with it "proactively in the

10. Counsel testified that he did not retain Dr. Sadoff in the hope of receiving a diagnosis of antisocial personality disorder; but, once Dr. Sadoff made that diagnosis, he was left with no choice but to address that reality:

That wasn't our approach at all—my approach at all. It came out. It had to be explained. If you introduce a report, the totality of the report is coming in. If you put this witness on the stand, that's coming out. We explained it. I explained it, okay? That's the purpose of the explanation of the anti-social personality disorder. And he did provide it as a mitigator, as I said. And it was the only mitigator from a diagnostic standpoint.... So that's why it came out. It was not the entire argument....

*Id.* at 51–52.

full context of Dr. Sadoff's professional medical explanation," and attempt to use it as best he could. *See* PCRA court opinion, 6/21/12, at 7–8.

As in all matters where counsel's effectiveness is being challenged, this Court must be careful to assess counsel's performance without the distortion of hindsight, and must instead reconstruct the actual circumstances under which counsel's decisions were made. *Commonwealth v. Birdsong,* 611 Pa. 203, 24 A.3d 319, 333 (2011).

Penalty phase counsel offered reasoned explanations for his strategy, which are supported by the record, and were credited by the PCRA court. Counsel believed that Dr. Sadoff's testimony would give jurors a perspective that appellant's family members and friends could not offer. However, he also knew that if he presented Dr. Sadoff's affirmatively helpful testimony, he necessarily had to address the antisocial personality disorder diagnosis. This was not a circumstance created by counsel, but a practical reality arising from the truth of the type of being his client is. Thus, counsel was left with a difficult choice of presenting no "impartial and objective" expert evidence through the testimony of Dr. Sadoff, and therefore limiting the jury's understanding of the family and historical testimony that was presented, or presenting Dr. Sadoff's testimony, including the diagnosis, to present a full human picture of his client, while attempting to make use of the antisocial personality disorder diagnosis as best he could. He chose the latter course of action, which falls in the realm of strategy.[11]

Now, with the aid of hindsight, appellant suggests that trial counsel was constitutionally obliged to proceed differently, and pursue a half-truth and an incomplete picture. That is indeed one possible strategy. But, in assailing penalty phase counsel, appellant proceeds upon the questionable and simplistic assumption that mental health diagnoses may, indeed must, be

11. Appellant's claim that counsel failed to perceive what was mitigating and what was aggravating ignores counsel's testimony, which revealed that counsel was well aware of the complexity and attempted to blunt the effect of the diagnosis.

categorized as a matter of law: they either provide aggravating evidence or mitigating evidence. The reality obviously is more complex, and counsel was not precluded from assessing the situation in light of the complexity. The Commonwealth in the penalty phase seeks death; a strategy that seeks to secure life in prison by presenting a full picture of the subject of the proceeding, with an explanation for his behavior, is not inherently unreasonable.

Appellant complains that the evidence was prejudicial because a person with antisocial personality disorder commits crimes, and the evidence may have reinforced in the minds of the jurors that appellant was an out of control individual who was dangerous. But, surely the jury had enough before it from the facts presented to them concerning appellant's three rapes and murders, and his fourth rape and attempted murder, to already draw that conclusion.

In any event, even with the aid of hindsight, any court would be hard pressed to find counsel ineffective based upon his chosen course of action in these circumstances, and no reasonable court could suggest that counsel's chosen course establishes *Strickland* prejudice. Without the testimony of Dr. Sadoff, appellant's case in mitigation would have been paltry, especially in the face of the mountain of aggravating circumstances. Had counsel acted as appellant now says he should have, counsel no doubt would be faulted for failing to present Dr. Sadoff's expert testimony. Penalty phase counsel appreciated, and best expressed, the dilemma himself when he said, "We didn't retain [Dr. Sadoff] for purposes of having him opining [sic] that he was an anti-social personality disorder, thanks for the diagnosis, I can't wait to run with this to the jury," but the diagnosis "came out. It had to be explained." N.T., 12/17/13, at 51–52. Accordingly, appellant has not established that counsel was ineffective for presenting the testimony of Dr. Sadoff, which necessarily included the antisocial personality disorder diagnosis.

Finally, for the reasons we have already articulated respecting appellant's first issue on appeal, even if appellant could be said to have proven the performance prong of *Strickland* on

this claim, he has not proven *Strickland* prejudice. The derivative claim of appellate counsel ineffectiveness also necessarily fails.

## IV. *Atkins*–Related Claim

■ Appellant next contends that his execution would violate the Eighth Amendment, in light of evolving standards of decency he perceives and what he characterizes as his severe brain damage. Appellant's Brief at 55–56 (citing *Roper v. Simmons*, 543 U.S. 551, 125 S.Ct. 1183, 161 L.Ed.2d 1 (2005) and *Atkins v. Virginia*, 536 U.S. 304, 122 S.Ct. 2242, 153 L.Ed.2d 335 (2002)). Appellant acknowledges that, in point of fact, neither *Roper* nor *Atkins* addressed or established a categorical exemption from capital punishment for murderers who are severely brain damaged, but instead he asks this Court to extend the *Atkins* and *Roper* decisions to include such individuals. Appellant contends that he shares many characteristics with people who are mentally retarded and also points out that he was only eighteen years and seven months old when he raped and murdered Ms. Fortney. According to appellant, he suffered from the same impetuousness, and ill-considered actions and decisions, that formed the basis for finding that a death sentence was unwarranted for the two classes of persons (mentally retarded individuals and individuals under the age of eighteen at the time they committed the murder) whom the U.S. Supreme Court has already exempted from the operation of the death penalty. Accordingly, appellant contends that the reasoning of *Atkins* and *Roper* should be extended to severely brain damaged individuals because the execution of such individuals offends the "evolving standards of decency that mark the progress of a maturing society." Appellant's Brief at 57 (*quoting Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 2 L.Ed.2d 630 (1958)). Appellant notes that "nearly every major mental health association" believes that the execution of severely brain damaged offenders should be barred by the Eighth Amendment. He concludes that his youth and severe brain damage at the time he committed this rape and murder, his third such crime and

■■■■■■■■■

fourth such assault, make him indistinguishable from the class of persons protected by *Roper* and *Atkins,* and he thus asks that the Court expand those decisions to exempt him from Pennsylvania law and the jury's verdict.

Appellant separately avers that the PCRA court erred in failing to reach the merits of his claim based upon his failure to raise it in his post-hearing submission. (Appellant did raise the claim in his amended petition.) According to appellant, sentencing ineligibility establishes a limit on the authority of the Commonwealth. As such, the not-yet-recognized "right" he invokes cannot be waived because the categorical prohibition on sentencing certain classes of people to death forbids the imposition of the punishment itself.

The Commonwealth responds that appellant does not suffer from profound brain damage and, at most, suffers from some frontal lobe impairment; and, in any event, there is no question that appellant does not fall into either category of defendants ineligible for the death penalty, as identified by the U.S. Supreme Court in *Roper* and *Atkins.* Instead, appellant asks this Court to create new law, without any support for his position. Additionally, the Commonwealth reminds, appellant is of average intelligence and to create\ any new Eighth Amendment exception in this case is without any basis in fact or law.

■■■■ This Court has broadly stated that questions relating to the legality of sentencing are not waivable. *Commonwealth v. Aponte,* 579 Pa. 246, 855 A.2d 800, 802 n. 1 (2004). Additionally, the *Atkins* Court explained that "the [United States] Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender," 536 U.S. at 321, 122 S.Ct. 2242, leaving little doubt that actual *Atkins* claims implicate the legality of sentencing. The fallacy of appellant's argument, of course, is that he does not have an *Atkins* claim or a *Roper* claim. Appellant acknowledges that the U.S. Supreme Court has not expanded the decision in *Atkins* to encompass, as a class, murderers proven to be brain damaged by a preponderance of the evidence, and exempt

them from the death penalty. Nor has there been a trending consensus in state legislatures to exempt murderers like him from capital punishment. The right he speaks of is not embraced by *Atkins,* and indeed, has not been recognized by any governing authority. Thus, under the current state of Eighth Amendment jurisprudence; appellant's judgment of sentence was not illegal on the ground he specifies.

*Atkins* is a controlling decision of the U.S. Supreme Court on a federal question. This Court has rejected requests to extend the reach of *Atkins* beyond the necessary commands of the decision. For example, in *Commonwealth v. Baumhammers,* 599 Pa. 1, 960 A.2d 59 (2008), the defendant asked this Court on direct appeal to expand the *Atkins* decision to encompass mentally ill defendants. The Court rejected the request, noting that we had twice before rejected similar arguments, *see Commonwealth v. Faulkner,* 528 Pa. 57, 595 A.2d 28, 38 (1991) and *Commonwealth v. Fahy,* 512 Pa. 298, 516 A.2d 689 (1986), and that *Baumhammers* did not advance a "compelling argument" to reconsider those decisions. *Id.* at 96–97. We have also declined to extend other aspects of *Atkins* beyond the necessary commands of the decision, when presented with preserved claims on direct appeal. *See Commonwealth v. Sanchez,* 614 Pa. 1, 36 A.3d 24, 54–59 (2011) (nothing in *Atkins* requires mental retardation determination to be made pre-trial by judge and Court will not implement such requirement). Likewise, in passing upon corollary questions arising from the retroactive application of *Atkins* on PCRA review, we have declined to recognize derivative, cognate federal constitutional rights. *Commonwealth v. Bracey,* 604 Pa. 459, 986 A.2d 128, 145 (2009) (no right to jury trial on *Atkins* claim presented on post-conviction review); *accord Commonwealth v. Cunningham,* 622 Pa. 543, 81 A.3d 1, 10–11 (2013) (PCRA appeal; holding that U.S. Supreme Court's decision in *Miller v. Alabama,* —— U.S. ——, 132 S.Ct. 2455, 183 L.Ed.2d 407 (2012) does not apply retroactively to defendants whose judgments of sentence were final at time of *Miller* decision; noting this Court's practice of proceeding no farther than required by extant, governing federal precedent).

Appellant's argument in this case goes beyond the argument made in *Faulkner* and *Baumhammers* because this is a collateral attack upon his conviction. In essence, appellant asks that his collateral appeal be made the vehicle by which to establish a new federal constitutional right that retroactively makes his sentencing claim both viable and non-waivable.

In general, the proper way to seek to secure innovations in constitutional law is upon direct review, not via the PCRA. At any time before he was tried or on post-verdict motions, appellant could have claimed that the Eighth Amendment should be expanded to exempt murderers in his particular circumstances from capital punishment. That would raise and preserve a federal claim he could seek to litigate through this Court as of right, and to the U.S. Supreme Court, in its discretion. He did not do so.

Instead, appellant is left with raising the issue on collateral review under the PCRA. But, the PCRA's eligibility provisions provide no easy harbor for the recognition, or creation, of new constitutional rights. The PCRA provides a mechanism for vindicating **existing** constitutional rights, and it also provides a mechanism for implementing new constitutional rules of retroactive application, no matter when the new rule is established. *See* 42 Pa.C.S. § 9545. But, the new rule has to exist already. Simply stated, by its terms, the PCRA does not deem cognizable claims such as appellant's that seek to innovate the new substantive federal constitutional rule that the prisoner would then have applied to himself retroactively. In short, his claim, even if deemed nonwaivable, is not cognizable under the PCRA. Appellant's theory never comes to terms with the requirements of the PCRA.[12]

12. Of course, we decide this case in the context of the federal issue actually forwarded to the Court and the terms of the PCRA. Particularly in light of the uncertainties and tensions that can arise in the wake of new federal constitutional decisions, we realize that there can be complexities. This author has noted, for example, that circumstances may arise when a new federal rule is sufficiently disruptive of state law to require the Court to consider an issue of Pennsylvania constitutional law independent of federal law and outside the parameters of the PCRA. *See, e.g., Cunningham,* 81 A.3d at 10 (Castille, C.J., concurring).

Accordingly, we conclude that this Court has no authority under the PCRA to create and apply the new federal constitutional right appellant seeks to innovate and have retroactively applied to him to undo his lawful, statutory penalty. If such a right is someday recognized and made retroactive, and appellant's death sentence has yet to be executed, he can file a serial PCRA petition and avail himself of Section 9545 of the Act, as defendants actually affected by the new death eligibility rules in *Atkins* and *Roper* have done.

## V. Mandate

Based on the above review of the claims raised on appeal, the order of the PCRA court is affirmed.

Jurisdiction is relinquished.

Justices EAKIN, BAER, McCAFFERY and STEVENS join the opinion.

Justice SAYLOR files a concurring opinion.

Justice TODD files a concurring opinion.

Justice SAYLOR, concurring.

I join Parts I and V of the majority opinion and concur in the result relative to the balance.

With respect to Parts II and III, concerning Appellant's claim that his penalty counsel performed a deficient mitigation investigation and was ineffective in the presentation of the evidence which he did uncover, I support the majority's decision to credit the post-conviction court's finding that Appellant failed to establish sufficient prejudice. I have difficulty, however, to the extent the majority attempts to rationalize penalty counsel's handling of the mitigation case, including the presentation of life-history witnesses and the opinion testimony from Dr. Sadoff. *See, e.g.,* Majority Opinion, at 379–80, 82 A.3d at 1018–19. As to the life-history aspect, the majority recognizes that the defense presentation was "paltry." *See id.* at 380, 82 A.3d at 1019. For my part, moreover, I fail to see that Dr. Sadoff's testimony added much "affirmatively helpful testimo-

ny" to the mix, *id.* at 379, 82 A.3d at 1018, or that the psychiatrist's testimony somehow converted a paltry case of life-history mitigation into a "full human picture of" Appellant, *id.* at 379, 82 A.3d at 1018. In point of fact, as I read the eight pages of transcript covering Dr. Sadoff's direct examination by penalty counsel, beyond reinforcing the Commonwealth's position that Appellant is a sociopath, the psychiatrist did little more than confirm the unremarkable propositions that substance abuse can affect conduct and that anti-social behavior can be learned. *See* N.T., Nov. 9, 1994, at 2575–83.

In other words, with or without Dr. Sadoff, the mitigation presentation was paltry, and, in such circumstances, I question the reasonableness of presenting this sort of expert testimony and thus requiring an explanation for the defense's own position that the defendant is a sociopath. *See, e.g., Cummings v. Sec'y for Dep't of Corr.,* 588 F.3d 1331, 1368 (11th Cir.2009) (observing that "a diagnosis of antisocial personality disorder ... is not mitigating but damaging"). On my review of this record, I see the absence of available strategic choices at the penalty stage as having more to do with the appointment, a month before trial, of a relatively new attorney with no experience in homicide cases as capital penalty counsel, *See* N.T., Dec. 17, 2010, at 21–22, 25, than with some inherent centrality to the defense mitigation case of the limited psychiatric testimony which counsel adduced.

Regarding Part IV, I support the majority's holding that the post-conviction process is not generally a forum for the innovation of new legal principles. Nevertheless, I am circumspect as to whether this approach should be absolute, particularly since we are now deferring to the post-conviction forum claims which traditionally were considered on direct appeal. *See Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726 (2002).

Justice TODD, concurring.

I join the Majority Opinion, with the following exceptions.

First, regarding the majority's rejection of Appellant's ineffectiveness claim concerning counsel's mitigation presentation, I share the concern expressed by Justice Saylor in his Concur-

ring Opinion that penalty-phase counsel's elicitation of evidence that, *inter alia,* his client is a sociopath, may not have constituted a reasonable defense strategy. *See* Concurring Opinion (Saylor, J.) at 385–86, 82 A.3d at 1022–23. Nevertheless, for the reasons ably expressed by the majority, I agree that Appellant was not prejudiced by any error in this regard. *See* Majority Opinion at 375–78, 82 A.3d at 1016–17.

Next, I do not join footnote 5 of the Majority Opinion, and in particular the dicta concerning the federal court's authority to appoint federally-financed counsel to litigate the instant Post Conviction Relief Act ("PCRA") petition.

Finally, I agree with the majority that, *as a general matter,* collateral proceedings are not the forum in which to seek innovation of principles of constitutional law; and that, rather, such claims must be brought on direct appeal. *See* Majority Opinion at 383–85, 82 A.3d at 1021–22. Accordingly, I join the majority's pronouncement and its application to Appellant's present claim under the Eighth Amendment. Critically, however, I would highlight the majority's caveat to this general rule regarding certain exceptional claims. *See id.* at 384 n.12, 82 A.3d at 1022 n.12. Moreover, I agree with a second caveat, identified by Justice Saylor in his Concurring Opinion, concerning the impact of our decision in *Commonwealth v. Grant,* 572 Pa. 48, 813 A.2d 726 (2002), and its progeny, wherein we have largely prohibited the raising of claims of counsel ineffectiveness on direct appeal. *See* Concurring Opinion (Saylor, J.) at 385–86, 82 A.3d at 1022–23. As a result of *Grant,* we have limited direct appeals as a forum for the innovation of federal or state constitutional law regarding the right to counsel; yet, our no-innovation construction of the PCRA would prohibit the raising of such claims collaterally as well. Accordingly, in the appropriate case, this conundrum may warrant modulation of our *Grant* line of decisions, or adjustments to our construction of the PCRA.