J-S46022-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| ALAN E. KUSHNER | |
| Appellant | No. 2357 EDA 2014 |

Appeal from the PCRA Order July 29, 2014
In the Court of Common Pleas of Montgomery County
Criminal Division at No(s): CP-46-CR-0009814-2008

BEFORE:  MUNDY, OLSON and MUSMANNO, JJ.:

MEMORANDUM BY OLSON, J.:                    **FILED October 6, 2015**

Appellant, Alan E. Kushner, appeals from the order entered on July 29, 2014 in the Criminal Division of the Court of Common Pleas of Montgomery County that denied his petition filed pursuant to the Post-Conviction Relief Act (PCRA), 42 Pa.C.S.A. §§ 9541-9546.  We affirm.

On or around October 30, 2008, the Lower Merion Township Police Department arrested and charged Appellant with criminal attempt – murder (18 Pa.C.S.A. § 901), criminal solicitation to commit murder (18 Pa.C.S.A. § 902), and criminal conspiracy to commit murder (18 Pa.C.S.A. § 903).

The charges arose from Appellant's efforts to hire an individual to kill his wife.[1]

Appellant retained counsel and proceeded to a jury trial in July 2009. At the conclusion of trial on July 30, 2009, the jury found Appellant guilty of criminal solicitation to commit murder. Thereafter, on October 23, 2009, the trial court sentenced Appellant to serve seven and one-half to 20 years in prison. Appellant filed post-sentence motions, which the trial court denied on March 4, 2010.

Appellant retained new counsel and pursued relief on direct appeal. We affirmed Appellant's judgment of sentence on December 8, 2010 and our Supreme Court denied further review on October 13, 2011.

After exhausting his direct appeal rights, Appellant hired new counsel who filed a petition for collateral relief on October 11, 2012. Appellant amended and supplemented his petition through subsequent filings on October 19, 2012 and January 16, 2013. The PCRA court conducted hearings on March 1st, May 20th, August 26th, and November 12th of 2013 to address the issues raised in Appellant's PCRA petitions. On July 29, 2014,

_____

[1] A thorough recitation of the historical facts underlying this appeal has been prepared by the PCRA court in its Pa.R.A.P. 1925(a) opinion. **See** PCRA Court Opinion, 11/14/14, at 1-6.

the PCRA court denied Appellant's request for collateral relief. This appeal timely followed.[2]

On appeal, Appellant claims that the PCRA court erred in dismissing his claims that prior counsel rendered ineffective assistance. To substantiate this contention, Appellant cites 11 acts and omissions that demonstrate subpar performance on the part of trial and direct appeal counsel. **See** Appellant's Brief at 12-14; Appellant's Concise Statement of Matters Complained of on Appeal, 10/1/14 (listing matters for review as issues (a) through (k)). Appellant's claims merit no relief.

"As a general proposition, [an appellate court] review[s] a denial of [PCRA] relief to determine whether the findings of the PCRA court are supported by the record and free of legal error." **Commonwealth v. Trieber**, 2015 WL 4886374, *3 (Pa. 2015). In this case, we carefully reviewed the certified record on appeal, the submissions of the parties, and the comprehensive opinion issued by the PCRA court. Based upon our review, we conclude that the record supports the PCRA court's findings of fact and that the court's legal conclusions are free of error. Hence, we affirm the dismissal of Appellant's collateral relief petition for the reasons expressed by the PCRA court and adopt its thorough and accurate

---

[2] Both Appellant and the PCRA court have complied with the procedures set forth in Pa.R.A.P. 1925.

determinations as our own.[3]  Going forward, the parties are instructed to include a copy of the PCRA court's opinion with all future filings concerning our disposition of the claims in this appeal.

Order affirmed.

_____

[3] We attach two minor caveats to our adoption of the PCRA court's determinations.  First, Appellant's brief to this Court presents issues (i) and (j) as claims alleging that trial and direct appeal counsel (respectively) were ineffective in failing to litigate challenges to the sufficiency of the evidence offered in support of Appellant's conviction.  Owing to some confusion in the description of these claims in Appellant's concise statement, the PCRA court addressed issues (i) and (j) as challenges to the weight of the evidence.  We adopt the rationale employed by the PCRA court as grounds for our rejection of Appellant's sufficiency challenges.

In addition, in discussing issue (k), the PCRA court held, in the alternative, that Appellant was not entitled to relief because his suppression issue was previously litigated on direct appeal.  Trial Court Opinion, 11/14/14, at 27.  This is technically incorrect, as Appellant raised this challenge under the guise of an ineffective assistance of counsel claim, which would not have been cognizable on direct review. *See Commonwealth v. Collins*, 888 A.2d 564, 573 (Pa. 2005) (holding that a claim of ineffectiveness of counsel is a discrete legal ground and not merely an alternative theory in support of an underlying issue that was raised on direct appeal).  Although we do not adopt this aspect of the PCRA court's reasoning, we agree with its determination that counsel performed effectively since he challenged the trial court's suppression ruling on direct appeal before this Court.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/6/2015

**IN THE COURT OF COMMON PLEAS OF MONTGOMERY COUNTY PENNSYLVANIA**
**CRIMINAL DIVISION**

COMMONWEALTH OF
PENNSYLVANIA

      v.

ALAN KUSHNER

:
:
:
:
:
:
:
:

NO. 9814-08

**O P I N I O N**

O'NEILL, J.                                                                          NOVEMBER _17_, 2014

Defendant, Alan Kushner, appeals from the Order dated July 29, 2014, denying his Petition for Post-Conviction Collateral Relief. For the reasons set forth below, the Order should be affirmed.

## I. FACTUAL AND PROCEDURAL HISTORY

The relevant facts were set forth by this court in an Opinion written to the Superior Court on May 28, 2010 as follows:

> On May 16, 2008, at approximately 10:45 p.m., Sarran Kushner returned to her home at 26 Righters Ferry Road in Bala Cynwyd, Montgomery County, after spending the evening with a female friend at the Philadelphia Museum of Art. She parked her white Cadillac Escalade in the driveway. Before exiting the vehicle she began to pull up the hood on her jacket because it was raining. As she lifted her hands to the side of her head, she heard a loud bang and felt pain in her wrist. She noticed blood running down her arm, and saw a hole in the driver's side window of her vehicle. Sarran Kushner had been shot.
>
> Defendant and Sarran Kushner (hereinafter "the victim") married in 1976. (N.T., 07/22/09, p. 76) They purchased the Righters Ferry Road property in 1983, and resided there together for more than 20 years with their two sons. At all times relevant, Defendant operated a chiropractic office at 6103 Lansdowne Avenue in Philadelphia County.
>
> After years of increasing marital disharmony, the victim commenced

divorce proceedings in this court in January 2006. (N.T., 07/22/09, pp. 84-85) The couple nevertheless continued to reside together, with Defendant engaging in hostile and threatening behavior toward the victim. (N.T., 07/22/09, pp. 87-92)

In particular, Defendant and the victim had agreed during the Summer of 2006 to spend alternating weekends at their vacation home in Ocean City, New Jersey. (N.T., 07/23/09, p. 104) With the Fourth of July holiday approaching, Defendant indicated that he wanted the vacation property that weekend, even though it was the victim's turn to use it. An argument ensued, during which Defendant advised the victim that "If you go down this weekend, you'll end up in the hospital." (N.T., 07/23/09, p. 105) Defendant would also turn off the refrigerator at the vacation property, with the result being that any food left therein would be spoiled and malodorous by the time the victim arrived for her weekend. (N.T., 07/22/09, p. 94)

Another argument during the Summer of 2006 resulted in Defendant pushing the victim from a computer in one of their son's bedrooms. (N.T., 07/22/09, p. 87; 07/23/09, p. 107) Defendant also told the victim that he had tampered with her car, and that she would be killed if she drove it, and that he wished she would be hit by a truck so he could laugh when she died. (N.T., 07/22/09, pp. 87-88)

On August 28, 2006, the victim obtained an Order in the divorce case granting her exclusive possession of the marital residence. (N.T., 07/22/09, p. 96) Defendant moved out of the house the following month, eventually settling in an apartment approximately two blocks away. (N.T., 07/22/09, p. 98) He nevertheless returned to the victim's residence on numerous occasions. (N.T., 07/22/09, p. 97) He also made hundreds of telephone calls to the victim's home, including more than 161 calls in October 2006 alone. (N.T., 07/22/09, p. 99) The victim, recognizing Defendant's telephone number on her "Caller I.D.," rarely answered the calls. Defendant would then leave voicemail messages for the victim such as "You should commit suicide. You should remove yourself from the equation. Leave. Everyone hates you." (N.T., 07/22/09, p. 99) During this time, and continuing into early 2007, Defendant also handwrote and mailed a series of discourteous letters to the victim. (N.T., 07/22/09, pp. 107-114, 118-125; Ex. C-6)

Based upon the telephone calls, the letters and an "incident" that occurred over the weekend of March 9, 2007, the victim sought a Temporary Protection from Abuse Order on March 14, 2007. (N.T., 07/22/09, p. 127) The victim received a final one-year Protection from Abuse Order after a hearing on May 8, 2007.

2

The "incident" involved a BMW the Kushners had purchased for one of their sons, Brian, who happened to be staying with the victim while he was home from college over the weekend of March 9, 2007. (N.T., 07/22/09, p. 134) Brian Kushner had taken the vehicle out Friday night. Defendant, who was angry with his son at the time and did not want him driving the car, telephoned the victim late that evening to demand that she "Get that car home." (N.T., 07/22/09, p. 134) When Brian Kushner returned home the victim told him not to use the car for the remainder of the weekend. (N.T., 07/22/09, p. 135) Around noon on Sunday, as the victim was leaving her home to go shopping, she noticed Defendant drive by. (N.T., 07/22/09, p. 135) Upon returning home about 40 minutes later, the victim pulled into her driveway only to find Defendant and his new girlfriend standing by while another male was entering the BMW. (N.T., 07/22/09, p. 135) The victim exited her vehicle and asked the man what he was doing. He responded that he had been told to take the BMW. (N.T., 07/22/09, p. 135) The victim advised the man that he was on private property, and that she was a co-owner of the vehicle. While the victim was standing near the BWM with her hand on the driver's side door handle, Defendant told the man to "Drive." (N.T., 07/22/09, p. 136) The victim let go of the vehicle and called the police.

Brian Kushner heard the commotion and ran out of the house, believing that his vehicle was being stolen. (N.T., 07/23/09, pp. 137-138) Once outside he observed a man he did not know sitting in the driver's seat of the BMW, and Defendant standing behind the vehicle. Brian jumped on the floorboard on the driver's side of the vehicle. (N.T., 07/22/09, p. 137; 07/23/09, p. 139) Defendant told the man in the vehicle to "Drive off." (N.T., 07/23/09, p. 139) The driver responded "I'm not going to drive off with your son standing on the car." (N.T., 07/23/09, p. 139) Defendant said "Drive off anyway." (N.T., 07/23/09, p. 139) The victim convinced her son to return to the house to await the police. The car was then driven to Defendant's apartment.

On May 17, 2007, the victim and Defendant attended a divorce proceeding at the Montgomery County Courthouse. Thereafter, while the victim was sitting in her car in front of the Courthouse, Defendant walked by, looked at her and said "Die." (N.T., 07/22/09, p. 141)

Michael Simmons, a long-time acquaintance of Defendant, had a conversation with him at some point between 2006 and 2007. (N.T., 07/23/09, p. 151) Defendant complained about how much money the divorce case was costing him. (N.T., 07/23/09, pp. 152-153) When Simmons indicated that it might be cheaper to settle the case, Defendant said he wished the victim were dead. (N.T., 07/23/09, p. 153) Defendant then asked Simmons if he "knew anybody." (N.T., 07/23/09, p. 153) When Simmons asked if Defendant meant "like a hit," Defendant

3

responded in the affirmative. (N.T., 07/23/09, p. 153) Simmons ended the conversation, and Defendant rarely patronized his business after that. (N.T., 07/23/09, pp. 153-154)

Around Halloween of 2007, Defendant hung in his chiropractic office a witch mask with the victim's name taped to the forehead. (N.T., 07/23/09, p. 22; 07/27/09, p. 9) He also displayed a collage of family photographs with the victim's face obscured with Wite-Out. (N.T., 07/23/09, p. 22; 07/27/09, p. 11)

Yvette Hawkins, a former medical receptionist at Defendant's office, observed the mask in Defendant's office. On one occasion Defendant told Hawkins to say "Hi" to the victim because she was on the wall. (N.T., 07/27/09, p. 9) Hawkins heard Defendant yell "Die, Sari, Die," on numerous occasions. (N.T., 07/27/09, p. 10) Defendant also asked Hawkins if she knew anything about voodoo dolls. (N.T., 07/27/09, p. 10)

In early 2008, Hawkins observed Defendant speaking with two men in his office after hours. (N.T., 07/27/09, pp. 11-15) She saw Defendant showing the men photographs from a CVS envelope. (N.T., 07/27/09, pp. 13-15) She could not see the images at the time, but subsequently viewed them when the opportunity presented itself. The photographs depicted the victim's house, surrounding hedges and cars parked at the residence. (N.T., 07/27/09, p. 14)

On April 15, 2008, Defendant had a telephone conversation with his then 25-year-old son, Robert Kushner, during which Defendant stated that he should have killed the victim. (N.T., 07/23/09, p. 23) Robert was upset by the statement and told his mother. Three days later the victim filed for an extension of her one-year PFA Order, which was set to expire on or around May 8, 2008. A hearing on that request was scheduled for May 6, 2008.

On April 21, 2008, Defendant again spoke with his son Robert, this time clarifying that what he really meant to say about the victim was that he "should have beaten the s**t out of her." (N.T., 07/23/09, pp. 23-24) Defendant also threatened Robert with retaliation if he testified against Defendant at the upcoming PFA hearing. Defendant said he would call the Narberth Basketball League, where Robert was a volunteer coach, to report that Robert had recently been arrested for drug possession. (N.T., 07/23/09, p. 26)

The victim received a three-year extension of the PFA Order after the hearing on May 6, 2008. (N.T., 07/22/09, p. 146) Robert Kushner testified at the hearing. The following day the Narberth Basketball League received an anonymous telephone report about Robert Kushner's recent

4

drug arrest. (N.T., 07/23/09, p. 26)

The victim was shot on May 16, 2008. The bullet, which was fired from behind the row of hedges next to the driveway, went completely through the victim's wrist. (N.T., 07/22/09, p. 161) The victim immediately drove herself to a nearby firehouse for assistance. While the victim was being removed from her car, a .40-caliber bullet fell from her sleeve. (N.T., 07/22/09, p. 153) The victim was taken by ambulance to the Hospital of the University of Pennsylvania, where she underwent surgery.

An investigation into the shooting ensued, with the victim indicating that she could think of no one who wanted to harm her other than Defendant. The investigation revealed that Defendant had had dinner at a restaurant with his father until approximately 8:30 p.m. on the night of the shooting, and that Defendant then retired to his apartment. (N.T., 07/28/09, p. 52) No arrests were made in the immediate aftermath of the shooting, and the shooter has never been identified.

In May 2008, Weldon Gary, a regular patient of Defendant's, was receiving a treatment for a back injury when Defendant began discussing his pending divorce. (N.T., 07/27/09, p. 122) Defendant, who was aware that Gary had been incarcerated in the past for domestic violence, told Gary he wanted to "get rid of" the victim. (N.T., 07/27/09, p. 122) Gary ended the discussion at that point. (N.T., 07/27/09, pp. 122-123) Defendant raised the subject again during a treatment in early July 2008. (N.T., 07/27/09, pp. 123, 165) Gary again declined to discuss the matter. (N.T., 07/27/09, pp. 165-166) Undaunted, Defendant raised the subject with Gary during an office visit in late July 2008. (N.T., 07/27/09, p. 167) When Gary asked Defendant how much he wanted to spend, Defendant responded "Whatever it takes." (N.T., 07/27/09, p. 123) Gary suggested $20,000, to which Defendant agreed. (N.T., 07/27/09, p. 123) Defendant gave Gary a $1,000 cash down payment, as well as directions to the victim's home and a description of her vehicle. (N.T., 07/27/09, pp. 123-124, 126) Gary accepted the down payment, but claimed that he secretly had no intention of carrying out the killing. (N.T., 07/27/09, p. 128) He also told his friend, Craig Lowman, about receiving $1,000 from Defendant. (N.T., 07/27/09, pp. 130, 218)

Over the next few weeks, Defendant asked Gary during subsequent office visits why the task had not yet been completed. (N.T., 07/27/09, p. 127) Defendant stated that he needed it done by August 21, 2008, which he described as the date of the divorce. (N.T., 07/27/09, p. 127) Gary made various excuses. During an office visit sometime after August 21, 2008, Defendant told Gary that he had missed the deadline. (N.T., 07/27/09, p. 129) Defendant said he still wanted the job done. (N.T.,

5

07/27/09, p. 129) After this visit, Gary discontinued his treatment with Defendant.

On September 16, 2008, Hawkins was filing papers in Defendant's office after hours when she and another co-worker overheard Defendant offering money to a male patient. (N.T., 07/27/09, pp. 17-20) Hawkins was troubled by what she had heard given that the victim had been shot a few months prior. (N.T., 07/27/09, p. 21) She contacted the victim's divorce attorney the following day to report the incident. (N.T., 07/27/09, pp. 32-34) Hawkins subsequently was contacted by Montgomery County detectives, and gave a written statement on September 30, 2008. She identified Gary and Lowman as persons who might have additional information.

On October 2, 2008, law enforcement authorities from Montgomery and Philadelphia Counties executed search warrants for Defendant's apartment and chiropractic office. Still hanging on a wall in Defendant's office was the collage of family photographs with the victim's face obscured. Detectives also found in Defendant's office the Halloween witch mask and photographs of the area where the victim had been shot. A search of Defendant's home resulted in the seizure of $75,000 in cash from Defendant's home safe, and handwritten notes containing words such as "son drugs" and "Sari Plan b."

Defendant was arrested on October 30, 2008, and charged with Attempted Murder, Solicitation to Commit Murder and Conspiracy to Commit Murder. At a trial that commenced on July 20, 2009, the jury heard testimony from, among others, the victim, the Kushners' two sons, Hawkins, Gary and Lowman. The jury ultimately found Defendant guilty of Solicitation to Commit Murder; verdicts of not guilty were returned on the charges of Attempted Murder and Conspiracy to Commit Murder.

On October 23, 2009, this court sentenced Defendant to seven-and-one-half to 20 years in prison. That same day, Defendant filed a post-sentence motion that would later be supplemented with court permission. After a series of continuance requests, this court heard oral argument on Defendant's post-sentence motion on February 18, 2010. At that proceeding, Defendant requested, and this court granted, an extension of time to decide the motion under Pa. R.Crim.P. 720(B)(3)(b). In an Order dated March 4, 2010, this court denied Defendant's motion for post-sentence relief.

Defendant filed a Notice of Appeal on March 22, 2010. On March 23, 2010, this court issued an Order directing Defendant to produce a Concise Statement of Errors Complained of on Appeal. Defendant timely complied with that directive.

(Trial Court Opinion, 05/28/10 pp. 1-10) (Footnotes omitted).

Thereafter, the Superior Court affirmed the judgment of sentence on December 8, 2010[1]. Our Supreme Court denied Defendant's Petition for Allowance of Appeal on October 13, 2011[2]. On October 11, 2012, Defendant, through counsel, filed a Petition for Post Conviction Relief Under Pa.C.S.A. Sections 9541 et seq. and Habeas Corpus Relief Under the Pennsylvania Constitution. A few days later, his PCRA counsel filed a Corrected Petition for Post Conviction Relief Under Pa.C.S.A. Sections 9541 et seq. and Habeas Corpus Relief Under the Pennsylvania Constitution on October 19, 2012. Defendant, *pro se*, then filed a "Petitioner's Pro Se Supplemental Petition for Post Conviction Relief Under 42 Pa.C.S. §9541 et seq." on January 16, 2013[3]. Four hearings were held to address all claims raised on March 1, 2013; May 20, 2013; August 26, 2013; and November 11, 2013.

This court issued an order denying all claims and dismissing Defendant's PCRA Petition on July 29, 2014. Defendant filed a timely Notice of Appeal on August 15, 2014. Accordingly on August 19, 2014, we issued an order directing Defendant to produce a Concise Statement of Errors Complained of on Appeal. Defendant has since complied with that directive.

## II.   ISSUES

Defendant raises the following allegations of error in his Concise Statement:

1. The Trial Court erred in denying Defendant's Petitions for Post Conviction Relief; when it found that Defendant had not been rendered ineffective

---

[1] See Commonwealth v. Kushner, No. 762 EDA 2010 (Pa. Super. December 8, 2010)
[2] See Commonwealth v. Kushner, No. 177 MAL 2011 (Pa. October 13, 2011)
[3] Defense counsel ultimately adopted the contentions Defendant set forth in this *pro se* supplemental PCRA at the hearing held on March 1, 2013. (N.T., 03/01/13 p. 12)

assistance of Trial and/or Appellate counsel as a result of the following:

(a.) Counsel's failure to move for a mistrial when the alleged *Brady* violation, regarding the Commonwealth's failure to make the Grand Jury Transcripts of witnesses prior testimony available to the Defense in pre-trial discovery, was uncovered;

(b.) Counsel's failure to move for a mistrial when the Commonwealth's Attorney made repeated, prejudicial and improper references to Defendant during his closing argument to the jury;

(c.) Counsel's failure to properly advise the Court of, and present to the Court evidence of, Defendant's mental and cognitive impairment prior to the Court's colloquy of the Defendant on his decision not to move for a mistrial in the afore-mentioned instances;

(d.) Counsel's failure to object to the improper admission of hearsay testimony offered by Commonwealth Witness, Craig Lowman, regarding statements allegedly made to him by Weldon Gary;

(e.) Counsel's failure to object to the improper admission of testimony offered by Commonwealth Witness, Michael Simmons, regarding statements allegedly made to him by Defendant;

(f.) Counsel's failure to move for a dismissal of the charges, where the Bills of Information filed against Defendant in the Court of Common Pleas failed to specify a date when the alleged offenses were to have occurred;

(g.) Counsel's failure to raise a jurisdictional challenge to Defendant's being tried the Montgomery County Court of Common Pleas, where the alleged "solicitation" to commit murder occurred in Philadelphia;

(h.) Counsel's failure to raise a request for a new trial in Post Sentence Motions, upon discovering that the Commonwealth had been intercepting and reading his legal correspondence, prior to and during trial;

(i.) Counsel's failure to raise a sufficiency of the evidence claim in Post Sentence Motions, where the sole conviction of Solicitation to Commit Murder was clearly against the weight of the evidence;

(j.) Counsel's failure to raise a sufficiency of the evidence claim on Appeal, where the sole conviction on the charge of Solicitation to Commit Murder was clearly against the weight of the evidence;

(k.) Counsel's failure to challenge the Court's denial of Defendant's Motion to Suppress evidence found as a result of the improper search of a safe, found within his residence, on Appeal.

## III. DISCUSSION

To be entitled to PCRA relief, Defendant must establish, by a preponderance of the evidence, that his conviction or sentence resulted from one or more of the

8

enumerated errors in 42 Pa.C.S.A. §9543(a)(2), his claims have not been previously litigated or waived, and "the failure to litigate the issue prior to or during trial ... or on direct appeal could not have been the result of any rational, strategic or tactical decision by counsel." Commonwealth v. Robinson, 82 A.3d 998, 1005 (Pa. 2013) (citing Commonwealth v. Rainey, 928 A.2d 215, 223 (Pa. 2007); and §9543(a)(3)-(a)(4)). An issue is previously litigated if "the highest appellate court in which [defendant] could have had review as a matter of right has ruled on the merits of the issue." Id. §9544(a)(2). An issue is waived if appellant "could have raised it but failed to do so before trial, at trial ... on appeal or in a prior state postconviction proceeding." Id. §9544(b).

In order to obtain relief on a claim of ineffectiveness, a PCRA petitioner must satisfy the performance and prejudice test set forth in Strickland v. Washington, 466 U.S. 668, 687, (1984). In Pennsylvania, we have applied the Strickland test by looking to three elements - the petitioner must establish that: (1) the underlying claim has arguable merit; (2) no reasonable basis existed for counsel's actions or failure to act; and (3) the petitioner suffered prejudice as a result of counsel's error, with prejudice measured by whether there is a reasonable probability that the result of the proceeding would have been different. Robinson, supra (citing Commonwealth v. Pierce, 527 A.2d 973, 975 (Pa. 1987)).

"Furthermore, counsel is presumed to have rendered effective assistance. Both the U.S. Supreme Court and this Court have made clear that a court is not required to analyze the elements of an ineffectiveness claim in any particular order of priority; if a claim fails under any necessary element of the Strickland test, the court may proceed

9

to that element first." <u>Robinson</u>, supra (citing <u>Strickland</u>; and <u>Commonwealth v. Albrecht</u>, 720 A.2d 693, 701 (Pa. 1998)). "Additionally, counsel obviously cannot be deemed ineffective for failing to raise a meritless claim." <u>Robinson</u>, supra (citing <u>Commonwealth v. Jones</u>, 912 A.2d 268, 278 (Pa. 2006)).

Regarding appellate counsel's ineffectiveness on direct appeal, Defendant may obtain relief if he can show appellate counsel was ineffective for failing to raise trial counsel's ineffectiveness. <u>Commonwealth v. Walker</u>, 36 A.3d 1, 6-7 (Pa. 2011) (citations omitted). To preserve a "layered" ineffectiveness claim, a petitioner must plead, in his PCRA petition, that appellate counsel was ineffective for failing to raise all prior counsel's ineffectiveness. Additionally, a petitioner must present argument on, i.e. develop each prong of the <u>Pierce</u> test as to appellate counsel's deficient representation. "Then, and only then, has the petitioner preserved a layered claim of ineffectiveness for the court to review; then, and only then, can the court proceed to determine whether the petitioner has proved his layered claim." <u>Walker</u>, supra (citing <u>Commonwealth v. Rush</u>, 838 A.2d 651, 656 (Pa. 2003)). Finally, in cases where appellate counsel is alleged to be ineffective for failing to raise a claim of trial counsel's ineffectiveness, the inability of a petitioner to prove each prong of the <u>Pierce</u> test in respect to trial counsel's purported ineffectiveness alone will be fatal to his layered ineffectiveness claim. <u>Commonwealth v. Carson</u>, 913 A.2d 220, 233 (Pa. 2006).

### A. – B.    Trial counsel was not ineffective for failing to move for a mistrial on two occasions.

Defendant argues that his trial counsel, Frank DeSimone, was ineffective because he failed to move for a mistrial on two occasions. The first occasion was when

10

an alleged Brady[4] violation was discovered, regarding the Commonwealth's failure to make the Grand Jury Transcripts of a witness's prior testimony available to the defense in pre-trial discovery per Pa.R.Crim.P. 573. This violation was discussed at a Brady hearing held Friday, July 24, 2009. Defense counsel DeSimone requested the hearing specifically because the Grand Jury Testimony of James Baker (from May 20, 2009) was not given to him until the second day of trial on the morning of July 23, 2009. (N.T., 07/24/09, pp. 6-7) Moreover, Attorney DeSimone alleged he was not given petitions filed by the Commonwealth for material witness warrants[5] or the disclosure of the name Yvette Childs which came up during investigations[6]. (N.T., 07/24/09, p. 24)

At the end of the hearing, Attorney DeSimone noted that Defendant did not want a mistrial to occur. (N.T., 07/24/09, p. 77) However, Attorney DeSimone indicated that his opening statement would have been different had he been aware of the information that was the subject of the Brady hearing. Id. At the close of the hearing, the court engaged in a colloquy of the Defendant in order to ascertain his position on asking for a mistrial. (N.T., 07/24/09, pp. 82-85) Defendant indicated that he agreed with his counsel's strategy decision not to request a mistrial, and the court found that he knowingly, intelligently, and voluntarily made this decision. (N.T., 07/24/09, p. 85)

---

[4] Brady v. Maryland, 373 U.S. 83 (1963).
[5] Referring to material witness warrants issued for Yvette Hawkins; Weldon Gary; and Craig Lowman. The court found that these disclosures were not mandatory and thus there was no discovery violation by the Commonwealth. (N.T., 07/24/09, p. 94)
[6] The court ultimately found that the Commonwealth was not required to disclose this name to the defense. (N.T., 07/24/09, p. 96)

11

The court ultimately found that the late disclosure of James Baker's Grand Jury Testimony would be a violation under Pa.R.Crim.P. 573(b)(1). Because the Commonwealth did not refuse or fail to disclose the transcript however and instead turned it over late, the court shifted the analysis to determine the prejudice imposed on the defense and how it could be cured at that particular time. (N.T., 07/24/09, p. 91) Thus, as a remedy we granted Attorney DeSimone the right to present a second opening statement to the jury. (N.T., 07/24/09, pp. 92-93) Furthermore, we gave the defense a one-day continuance (Friday, July 24, 2009), plus the weekend to interview James Baker and gather the information they needed in order to conduct an effective cross-examination of this potential witness. Id.

At the PCRA hearing, Attorney DeSimone testified to the basis for his actions and trial strategy in not requesting a mistrial due to the discovery violation. First, he did not want a mistrial because he was able to question the Commonwealth's credibility in front of the jury by bringing the discovery violation to the court's attention. (N.T., 03/01/13, p. 74) Second, he was given the opportunity to give a second opening statement where he again was able to comment on the Commonwealth's credibility. Id. Next, the defense was given a continuance and three days to prepare with the belated discovery information and extensively cross-examine the witnesses with it. (N.T., 03/01/13, pp. 77- 78) Finally, the Defendant did not want a mistrial as evidenced by the court's colloquy as stated above, and he was actually upbeat because the discovery violation turned into a positive for the defense due to the remedies they were granted. (N.T., 03/01/13, p. 74, 78)

12

We found that Attorney DeSimone acted reasonably in not requesting a mistrial. His PCRA testimony demonstrated his tactical decision to use the belated discovery to the defense's advantage and not request a mistrial in a case that he already thought was going well for them. (N.T., 03/01/13, p. 74) We therefore submit that the Defendant has not met his burden of overcoming the presumption that his counsel was effective. See Commonwealth v. Rivers, 786 A.2d 923 (Pa. 2001) (finding that courts will not second-guess trial counsel's trial tactics, so long as there is a reasonable basis for what trial counsel did or did not do.)

The second occasion in which Defendant alleges Attorney DeSimone was ineffective for failing to request a mistrial occurred during the Commonwealth's closing argument. Defense counsel objected to the Commonwealth's negative characterization of the Defendant at certain times during their argument. Specifically, Attorney DeSimone pointed out that the Commonwealth stated the Defendant "is nuts"; "he's got a screw loose"; "he's a clown"; and "was father of the year". (N.T., 07/29/09, p. 157) Accordingly, he indicated to the court that these statements, among others, were grounds for a mistrial in his opinion. (N.T., 07/29/09, p. 160) The court then stated that the possible remedies were for the defense to request a mistrial, or seek cautionary and curative instructions. (N.T., 07/29/09, p. 167)

After Attorney DeSimone was given time to speak with his client in private, the court engaged in colloquy with the Defendant regarding his decision to request a mistrial. (N.T., 07/29/09, pp. 167-171) The court found that he knowingly, intelligently, and voluntarily made the informed decision that he was not going to direct his counsel to request a mistrial. (N.T., 07/29/09, p. 171) Accordingly, this

13

court gave a curative instruction regarding the statements made by the Commonwealth in which the defense objected to. (N.T., 07/30/09, pp. 6-8)

Attorney DeSimone testified at the PCRA hearing that he spoke with other counsel assisting with the case Stephen Patrizio and Jules Epstein[7], Defendant's father, and Defendant himself regarding the potential motion for a mistrial. (N.T., 03/01/13, p. 29) He considered that his client was facing a mandatory maximum of 15 – 30 years on one of the three charges. Id. Although Attorney DeSimone acknowledged that a mistrial might be the safest way to go in light of this substantial sentence, he was also aware that if a mistrial was granted, the defense would not be able to duplicate "surprise element[s]" that occurred throughout the instant trial. Id.

Further, Attorney DeSimone indicated that a lot of good things happened in the trial, which was ultimately confirmed by two acquittals out of three charges, including the 15 – 30 year mandatory sentence. (N.T., 03/01/13, p. 37) For example, Attorney DeSimone was able to cross-examine one of the Defendant's sons and impeach him when the son said he was never in the courthouse before, yet testified previously in another hearing. (N.T., 03/01/13, p. 39) This impeachment tactic would have been gone in the next trial, and the defense would not have had the same opportunity to call the son's credibility into question. Id.

That being said, Attorney DeSimone was still concerned about the mistake in error and put what he calls his ethical obligation on the record. (N.T., 03/01/13, pp. 40, 41, 49, 50) He told the court he was conflicted about whether to continue with a request for a mistrial and placed the reasons he believed a mistrial was warranted on

---

[7] While Mr. DeSimone was the primary trial attorney, Mr. Epstein and Mr. Patrizio both assisted with the case. (N.T. 03/01/13, p. 17)

14

the record. (N.T., 03/01/13, pp. 41, 49, 50, 81) Ultimately, Attorney DeSimone did not press the request for a mistrial and consulted with other counsel and the Defendant to make the decision that cautionary instructions would suffice. (N.T., 03/01/13, p. 83)

We found that Attorney DeSimone had a reasonable basis for his actions regarding the second potential motion for a mistrial. He properly weighed and conveyed the ramifications for moving for a mistrial versus not moving for one with his client. They ultimately came to the decision to accept curative instructions due to their assessment of the defense-favorable evidence that was presented to the jury. See Commonwealth v. Chmiel, 30 A.3d 1111 (Pa. 2011), ("Reasonable basis" prong of an ineffective assistance claim does not question whether there were other more logical courses of action which counsel could have pursued, but, rather, examines whether counsel's decisions had any reasonable basis.)

Finally, this court noted in the Opinion we submitted as a result of Defendant's direct appeal,

> These characterizations of Defendant and his behavior were made in the context of the evidence presented at trial, and represented oratorical flair. Moreover, the statements were not of such a nature as to so prejudice the jury against Defendant that no objective and fair verdict could be rendered. Accordingly, no prosecutorial misconduct occurred in connection with the alleged name-calling.

(Trial Court Opinion, 05/28/10 pp. 15-16) Since we ultimately found that no prosecutorial misconduct existed, Defendant cannot prove that the alternative, i.e. a motion for a mistral, would have been granted had counsel chosen to go that route. See Chmiel, 30 A.3d 1127, (On an ineffective assistance claim, the Supreme Court will conclude that counsel's chosen strategy lacked a reasonable basis only if defendant

15

proves that an alternative not chosen offered a potential for success substantially greater than the course actually pursued.) Accordingly, Defendant cannot establish the reasonable basis element of the Strickland test in either issue A. or B. Therefore, Attorney DeSimone cannot be deemed ineffective and these claims must fail.

### C. Trial counsel was not ineffective for failing to advise the Court of Defendant's alleged mental and cognitive impairment.

Coupled with the motion for mistrial ineffectiveness claims as discussed above, the Defendant alleges that Attorney DeSimone was also ineffective for not advising the court of his alleged mental and cognitive impairments before the court engaged in colloquies with the Defendant. This claim must also fail for the following reasons.

At the PCRA hearing, the defense presented the testimony of Dr. Jonathan H. Mack, a licensed psychologist (N.T., 05/20/13, p. 5) and expert in neuropsychology (N.T., 05/20/13, p. 21). Dr. Mack testified that Defendant has a long-standing pattern of executive frontal lobe dysfunction that affects his ability to make appropriate, sound and rational decisions while under stress. (N.T., 05/20/13, pp. 35-46) Additionally, he opined that there is evidence of a rigid, obsessive-type personality that tends to be self-centered and narcissistic and that Defendant is an individual whose ability to modulate his responses and think about the environmental consequences of those actions is absolutely impaired. (N.T., 05/20/13, p. 38)

The Commonwealth extensively cross-examined Dr. Mack where he conceded that a majority of the tests conducted show Defendant was not impaired or only mildly impaired. See (N.T., 05/20/13, p. 65); (N.T. 08/26/13, pp. 9-13) Furthermore, Dr. Mack testified that the Defendant functions in the overall high-average range of intellectual ability. (N.T., 05/20/13, p. 34) His IQ, memory, processing speed, and

16

working memory are all normal. (N.T., 05/20/13, p. 65) Moreover, Defendant sustained a successful chiropractic office for thirty years which required him to generate and implement strategies to deal with ailments, individualize treatment plans for each patient, monitor treatments through follow-up visits with the goal of fixing or minimizing ailments, and generally engage in goal-oriented behavior. (N.T., 08/26/13, pp. 49-50) These behaviors are all components of executive functioning which involve the frontal cortex and appear to contradict or diminish Dr. Mack's overall findings of executive frontal lobe dysfunction in the Defendant. (N.T., 05/20/13, pp. 84-85)

Attorney DeSimone testified that he did not notice any indication of psychological or psychiatric issues with Defendant, and in fact noted that Defendant always appeared articulate and rational. (N.T., 03/01/13, pp. 19-21, 61) Defendant understood issues and inquired when he didn't; participated in every legal discussion; asked and responded appropriately to questions; and actively participated in his defense. (N.T., 03/01/13, pp. 22, 61, 65) Further, Defendant listened to Attorney DeSimone's advice not to take the stand and testify on his own behalf, suggesting his decision-making capabilities were intact. (N.T., 03/01/13, p. 22)

Based on his dealings with the Defendant, Attorney DeSimone never considered hiring a psychologist or psychiatrist to examine the Defendant. (N.T., 03/01/13, pp. 72-73) Therefore he also did not advise the court that his client had mental impairments because he did not believe any existed. (N.T., 03/01/13, p. 72) Moreover, neither of the other two attorneys assisting with the case, Mr. Patrizio and Mr. Epstein, ever expressed concerns about Defendant's mental capabilities or suggested that they should get him evaluated. (N.T., 03/01/13, p. 71)

17

We found Attorney DeSimone acted reasonably in not presenting evidence and advising the court of Defendant's alleged mental impairment. Based on his PCRA testimony, Attorney DeSimone credibly and extensively described his interactions with the Defendant and it is apparent the two engaged in a typical attorney-client relationship. We submit that other attorneys, as evidenced by Mr. Patrizio and Mr. Epstein, would have engaged in the same trial strategy, i.e. not presenting evidence of alleged mental impairments they did not believe existed. See Commonwealth v. Chmiel, 889 A.2d 501, 540-41 (Pa. 2005) (To sustain a claim of ineffectiveness, the defendant must prove that the strategy employed by trial counsel "was so unreasonable that no competent lawyer would have chosen that course of conduct.")

Finally, we must note that Dr. Mack's testimony has not persuaded us that Defendant met his burden of overcoming counsel's effectiveness. While Defendant may say inappropriate things and act highly unprofessional at times, as Dr. Mack indicated, this court found nothing in the record to suggest that he was incapable of consulting with counsel, participating in his defense, and engaging in colloquies with the court in order to make informed, intelligent, knowing, and voluntary decisions.

**D. – E.     Trial counsel was not ineffective for failing to object to admission of the testimonies of Craig Lowman and Michael Simmons.**

Prior to trial, Attorney DeSimone filed a motion in limine to preclude testimony pertaining to Craig Lowman and Michael Simmons. (N.T., 07/20/09, p. 58); (N.T., 03/01/13, p. 85) However, this court deferred ruling on that motion because we wanted to make a ruling during the context of the trial. (N.T., 07/20/09, pp. 11-12, 59); (N.T., 03/01/13, p. 86)

18

Regarding Craig Lowman, Attorney DeSimone was seeking to preclude his testimony that another witness, Gary Weldon, told him about a $1,000 down-payment the Defendant gave to Weldon to kill the Defendant's wife. However, a few days into the trial, Gary Weldon testified that he told Craig Lowman about receiving the $1,000 payment. (N.T., 03/01/13, p. 86) During cross-examination, Attorney DeSimone heavily attacked Weldon Gary's credibility and tried to show that he and Craig Lowman were making the whole thing up in order to get the reward money that was being offered. Id.

Prior to Craig Lowman's testimony, Attorney DeSimone and the Commonwealth engaged in a conference with the court. At that time, the Commonwealth argued that Lowman's testimony was admissible as a prior consistent statement to rebut the charge of fabrication Attorney DeSimone suggested during Gary Weldon's testimony. (N.T., 03/01/13, p. 87) Over Attorney DeSimone's argument that it was inadmissible, the court indicated that we agreed with the Commonwealth and the testimony was admissible. Id. Thus, Attorney DeSimone decided not to make a futile object in front of the jury. (N.T., 03/01/13, p. 88) Rather, his strategy was to impeach Lowman and attempt to paint him as a liar. Id. Impeachment is a common tactic used by counsel to attack the credibility of a witness. Attorney DeSimone acted swiftly in engaging in this new strategy when he learned of the court's decision to allow Lowman's testimony as a prior consistent statement. We found this to be a reasonable response to the court's ruling and as such, Defendant has not overcome the presumption of effectiveness.

A for Michael Simmons testimony, the record reflects that he testified about a

19

conversation he had with the Defendant sometime in 2006 or 2007. Specifically, the Defendant was talking to Mr. Simmons about his divorce and complaining about lawyer's fees. (N.T., 07/23/09, pp. 152-153) Mr. Simmons testified that Defendant went as far as to say he wished his wife was dead, and proceeded to ask Mr. Simmons if he knew anyone who could perform a hit on her. (N.T., 07/23/09, p. 153) Instantly, Defendant argues that Mr. DeSimone should have objected to this testimony and was ineffective for not doing so. We disagree however. Although the court indicated during the pre-trial motions hearing that we would reserve a final ruling on the motion in limine to preclude Michael Simmons' testimony, we also noted that we would generally permit testimony from witnesses regarding the domestic conflict history between the Defendant and his wife. (N.T., 07/20/09, pp. 91-92)

Mr. Simmons' testimony was admissible as an exception to the prior bad acts rule, Pa.R.Crim.P. 404(b), since it was relevant to show a sequence of events regarding the domestic conflict between the Defendant and his wife and his hostility towards her. See Commonwealth v. Mayhue, 639 A.2d 421, 434-435 (Pa. 1994) (holding evidence of the death of a hitman, who accepted money to kill defendant's wife but failed to do so, admissible under the res gestae exception to the general proscription against evidence of prior criminal acts, where such piece of evidence provided another piece of a puzzle which, once completed, revealed defendant's wife's murder to be the culmination of a series of cold, calculating, and unrelenting attempts to bring about her demise); and Commonwealth v. Buchanan, 689 A.2d 930 (Pa. Super. 1997) (where evidence that, two weeks prior to ordering assault on victim, defendant ordered witness' assault and exile from biker's club by uttering the words "[d]o what you got to

20

do" to an associate was admissible to demonstrate witness's motive to set up victim's beating in order to get back into defendant's good graces and to develop the facts of the witness' story of the defendant's soliciting and conspiring.) Therefore, since the issue underlying Defendant's claim of ineffective assistance of counsel is meritless, such claim fails and Attorney DeSimone was not ineffective for failing to object to the testimony.

**F.**     **Trial counsel was not ineffective for failing to move for a dismissal of charges because the Bills of Information did not specify a date when the alleged offenses were to have occurred.**

Defendant next alleges that Attorney DeSimone was ineffective for failing to request a dismissal of charges since the Information did not specify a date when the alleged offenses were to have occurred. The Bill of Information, filed March 9, 2009, alleged the crimes occurred "from the Fall of 2007 through September 2008."

At trial, Weldon Gary testified that while he was at an appointment at Defendant's chiropractic office, the Defendant told Mr. Gary sometime in May of 2008, that he wanted to get rid of his wife. (N.T., 07/27/09, p. 122) The Defendant brought up getting rid of his wife again to Mr. Gary in June or July of 2008 during another appointment. (N.T., 07/27/09, p. 123) At this appointment, the Defendant and Mr. Gary agreed on an amount, $20,000, for Mr. Gary to kill Defendant's wife. Id. Although Mr. Gary could not remember the exact dates, he testified that he went back to Defendant's office the very next day and collected a $1,000 down-payment. (N.T., 07/27/09, pp. 124-125) The Defendant indicated to Mr. Gary that he needed the job done by August 21, 2008. (N.T., 07/27/09, p. 127) When Mr. Gary did not complete the task by August 21, 2008, Defendant told him he still wanted it done. (N.T.,

21

07/27/09, p. 129)

"Du[e] process is not reducible to a mathematical formula, and the Commonwealth does not always need to prove a specific date of an alleged crime." Commonwealth v. Brooks, 7 A.3d 852, 858 (Pa. Super. 2010) (citing Commonwealth v. Devlin, 333 A.2d 888, 892 (Pa. 1975)). Furthermore, Pa.R.Crim.P. 560(B)(3) affords that it shall be sufficient for the Commonwealth to provide in the Information, if the precise date of an offense is not known, an allegation that the offense was committed on or about any date within the period fixed by the statute of limitations.

Defendant's conduct, which resulted in a guilty verdict to Criminal Solicitation, clearly occurred over a period of Mr. Gary's chiropractic appointments. Although Mr. Gary could not provide exact dates, he was able to estimate the time period of when the solicitations occurred. Case law has "established that the Commonwealth must be afforded broad latitude when attempting to fix the date of offenses which involve a continuous course of criminal conduct." Brooks, supra (citing Commonwealth v. G.D.M., Sr., 926 A.2d 984, 990 (Pa. Super. 2007)). Since the solicitations occurred over a period of time and not just on one particular day, the Commonwealth was not required to allege a specific date in the Information. Thus, there is no merit to the underlying claim and Attorney DeSimone can therefore not be found ineffective in failing to challenge it.

G.      **Trial counsel was not ineffective for failing to raise a jurisdictional challenge.**

Defendant next asserts that Attorney DeSimone was ineffective for not raising a jurisdictional challenge to the trial taking place in Montgomery County because the solicitation occurred in Philadelphia at Defendant's chiropractic office. As this claim

22

also has no merit, Attorney DeSimone was not ineffective in this respect.

Prior to trial, the Philadelphia County District Attorney and the Montgomery County District Attorney signed an agreement to transfer the proceedings from Philadelphia to Montgomery County. (N.T., 11/12/13, p. 65; Ex. C-19) Although the solicitation occurred in Philadelphia County at Defendant's office[8], the crime was to be carried out at the martial home of Defendant and his wife in Bala Cynwyd[9], Montgomery County. (N.T., 07/27/09, p. 126) As such, Montgomery County was the proper jurisdiction to hear the instant case. See Commonwealth v. Carey, 439 A.2d 151, 155 (Pa. Super. 1981) (It's logical that even though the original solicitation may have taken place in Philadelphia County, the ultimate act was to be performed in Delaware County and that county should have jurisdiction to try the defendant.)

**H.** **Trial counsel was not ineffective for failing to request a new trial on the basis that the Commonwealth was intercepting and reading Defendant's legal correspondence from the prison.**

We find no merit in Defendant's contention that the Commonwealth was intercepting and reading his legal correspondence from the prison. The only evidence Defendant produced to support this contention was his own allegation. (N.T., 11/12/13 pp. 29-32) On the contrary, the prosecuting Deputy District Attorney, Thomas W. McGoldrick, testified that he never had communications with anyone at the correctional facility regarding Defendant's legal mail. (N.T., 11/12/13, p. 66) Furthermore, he never saw legal mail between Defendant and his counsel. (N.T., 11/12/13, p. 67) We afford all credibility regarding this issue to Mr. McGoldrick and

---

[8] 6103 Lansdowne Avenue, Philadelphia, PA 19151 See (Crim. Compl., 12/22/2008)
[9] 26 Righter's Ferry Road, Bala Cynwyd, Lower Merion Township, Montgomery County See (Crim. Comp., 12/22/2008)

23

thus Defendant's claim is meritless. See <u>Commonwealth v. Johnson</u>, 966 A.2d 523, 540 (Pa. 2009) (When a PCRA hearing is held, and the PCRA court makes findings of fact, we expect the PCRA court to make necessary credibility determinations.)

**I. – J.** **Counsel was not ineffective for failing to argue the verdict of guilty to Solicitation to Commit Murder was against the weight of the evidence.**

Defendant raises two ineffective assistance of counsel claims with regard to post-sentence motions. First, he alleges that Attorney DeSimone failed to raise a sufficiency of the evidence claim in post-sentence motions where the sole conviction on the charge of Solicitation to Commit Murder was clearly against the weight of the evidence[10]. The record belies this claim. Attorney DeSimone did file a post-sentence motion asserting the guilty verdict to Criminal Solicitation was against the weight of the evidence. See (Post-Sent. Motion, 10/23/2009, #2) Therefore, Attorney DeSimone cannot be deemed ineffective for failing to do something that he in fact did. <u>Commonwealth v. Spotz</u>, 896 A.2d 1191, 1224 (Pa. 2006) (finding we will not deem counsel ineffective for failing to object to a statement when he in fact did object to that statement...).

---

[10] It appears counsel, in his Concise Statement is mixing language from both a sufficiency of the evidence claim per Pa.R.Crim.P. 606 and a weight of the evidence claim per Pa.R.Crim.P. 607.

A challenge on appeal to the sufficiency of the evidence triggers an analysis of whether or not the Commonwealth carried its trial burden of presenting evidence sufficient to enable the fact-finder to determine every element of the crime charged beyond a reasonable doubt. <u>Commonwealth v. Andrulewicz</u>, 911 A.2d 162, 165 (Pa. Super. 2006) (citations omitted).

Whereas, a true weight of the evidence challenge concedes that sufficient evidence exists to sustain the verdict but questions which evidence is to be believed. <u>Commonwealth v. Morgan</u>, 913 A.2d 906, 909 (Pa. Super. 2006) (citations omitted).

In the PCRA Petition, filed October 19, 2012, the defense alleges that trial counsel and appellate counsel were ineffective for failing to argue that the verdict was against the weight of the evidence. (PCRA Pet. 10/19/12, #14(f)) Therefore, that is what we will address in this Opinion.

Secondly, Defendant contends that appellate counsel, Burton A. Rose was ineffective for failing to raise a claim on appeal that the conviction of Solicitation to Commit Murder was against the weight of the evidence. However, the verdict was not against the evidence and Attorney Rose can therefore not be deemed ineffective for failing to raise it on appeal.

A true weight of the evidence challenge concedes that sufficient evidence exists to sustain the verdict but questions which evidence is to be believed. Commonwealth v. Morgan, 913 A.2d 906, 909 (Pa. Super. 2006) (citing Commonwealth v. Charlton, 902 A.2d 554, 561 (Pa. Super. 2006) (quoting Commonwealth v. Galindes, 786 A.2d 1004, 1013 (Pa. Super. 2001)). The weight of the evidence is exclusively for the finder of fact who is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses. Commonwealth v. Champney, 832 A.2d 403, 408 (Pa. 2003)). Accordingly, a weight of the evidence challenge contests the weight that is accorded the testimonial evidence. Commonwealth v. Morgan, 913 A.2d 906, 909 (Pa. Super. 2006) (citing Armbruster v. Horowitz, 744 A.2d 285, 286 (Pa. Super. 1999)).

As noted above, during trial, Weldon Gary testified that the Defendant offered him $20,000 to kill Defendant's wife. Furthermore, he received a $1,000 down-payment from the Defendant as an advance and the Defendant gave Mr. Gary the directions to his wife's house in Bala Cynwyd and a description of her vehicle. This testimony was corroborated by the testimony of Craig Lowman, who testified that sometime in 2008, Mr. Gary told him the Defendant gave him $1,000.

In reaching their verdict, the jury clearly chose to believe the testimonies of Mr. Gary and Mr. Lowman. That is their province and since these testimonies sufficiently

25

established the elements of Criminal Solicitation[11] to Commit Murder, we submit the verdict was not contrary to the evidence as to shock one's sense of justice. See Commonwealth v. Kane, 10 A.3d 332-333 (Pa. Super. 2010). Thus, the underlying claim is meritless and we therefore cannot find appellate counsel ineffective for not raising it on appeal.

**K.**     **Trial counsel was not ineffective for failing to challenge the court's denial of Defendant's Motion to Suppress evidence.**

Defendant's final claim is that appellate counsel, Attorney Rose, was ineffective for failing to challenge the court's denial of Defendant's Motion to Suppress the evidence that was found as a result of the improper search of a safe that was in his residence. Again, this claim has no merit because Attorney Rose did in fact challenge this court's suppression ruling. Specifically, in his Concise Statement filed March 31, 2010, Attorney Rose raised the issue as follows:

> The Defendant's pretrial motion to suppress evidence seized from his home on October 2, 2008, particularly the $75,000.00 cash taken from his safe, should have been granted because, under the four corners of the Affidavit of Probable Cause, there was inadequate probable cause to justify the search and seizure of the Defendant's residence. There was an insufficient basis for the issuing authority to reasonably conclude that the Defendant's residence contained evidence of criminal activity on October 2, 2008. As a result, the Commonwealth was able to introduce at trial evidence of the $75,000.00 cash to argue to the jury that this was evidence of the Defendant's guilt which also provided corroboration of the inculpatory solicitation testimony of Weldon Gary[.] (Citation to notes of testimony omitted).

(Def. Concise Statement, 03/31/2010 #2). On appeal, the Superior Court found the

---

[11] A person is guilty of solicitation to commit a crime if with the intent of promoting or facilitating its commission he commands, encourages or requests another person to engage in specific conduct which would constitute such crime or an attempt to commit such crime or which would establish his complicity in its commission or attempted commission. 18 Pa.C.S.A. §902

suppression challenge meritless. <u>Commonwealth v. Kushner</u>, No. 762 EDA 2010, p. 5 (Pa. Super. Dec. 8, 2010). This claim is therefore waived as being previously litigated per 42 Pa.C.S.A. §9543(a)(3); and §9544(a). Nevertheless, we clearly cannot find Attorney Rose ineffective for failing to challenge the suppression ruling on appeal when he in fact did just that. See <u>Commonwealth v. Spotz</u>, 896 A.2d 1191, 1224 (Pa. 2006)

## IV. CONCLUSION

Based upon the foregoing, this court respectfully requests that the Superior Court affirm the Order denying Defendant's Petition for Post-Conviction Collateral Relief.

**BY THE COURT:**

**STEVEN T. O'NEILL    J.**

Copies mailed on 11/17/14
to the following:
Robert Falin, Esq. (District Attorney's Office)
Martin Mullaney, Esq.

(Secretary)

27